**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

    v.

MODESTO DELGADO,
         *Defendant-Appellant.*

No. 07-50238

D.C. No.
CR-06-00636-H

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Submitted July 16, 2008*
Pasadena, California

Filed October 7, 2008

Before: Barry G. Silverman, Johnnie B. Rawlinson, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Rawlinson

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

14211

## COUNSEL

Mary F. Prevost, San Diego, California, for appellant Modesto Delgado.

Lawrence E. Spong, Assistant United States Attorney, San Diego, California, for appellee United States.

## OPINION

RAWLINSON, Circuit Judge:

Appellant Modesto Delgado (Delgado) was convicted of possession of cocaine with the intent to distribute based on

cocaine found during a warrantless inspection of his commercial truck in Missouri. Delgado challenges the district court's denial of his motion to suppress. Delgado maintains that commercial trucking is not subject to warrantless inspections as a pervasively regulated industry under *New York v. Burger*, 482 U.S. 691 (1987). Delgado also asserts that the state trooper's search of Delgado's truck violated the Fourth Amendment by going beyond the proper regulatory scope of an administrative search.

Additionally, Delgado challenges the district court's denial of his motion for judgment of acquittal due to improper venue. Delgado posits that venue was improper in the Southern District of California because there was no evidence that the cocaine was placed in his truck in southern California, and the government impermissibly relied on his confession without introducing independent corroborating evidence to support its veracity.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's judgment.

## I. BACKGROUND

Delgado was charged in a two-count indictment with conspiracy to distribute cocaine, and possession of cocaine with the intent to distribute.

Delgado filed a motion in limine to suppress the evidence found in his truck premised on Fourth Amendment violations. During the suppression hearing, Officer Jerrold Brooks, "a commercial vehicle officer for the Missouri State Highway Patrol," testified that he was responsible for enforcing Missouri's commercial vehicle regulations. Officer Brooks observed that he had "limited police powers. The Missouri state troopers have full police powers and they enforce all the regulations." Officer Brooks could not make custodial arrests. Instead, it was his responsibility "[t]o make sure the drivers

are qualified to drive the trucks, have the right credentials, driver's license, logs, hours of service, equipment . . . [and to] make sure that all their equipment is up to safety standards." According to Officer Brooks, he has the authority pursuant to Missouri's Code to stop vehicles "without observing any traffic violations."

While "parked on the side of I-44," Officer Brooks saw a passing truck with a company name that he did not recognize. He did not notice "any violations of the vehicle code," or "anything illegal at that time." Officer Brooks testified that the unfamiliar company name was important because "[t]here's a lot of new companies that come up, and we have found that sometimes they don't always have the right credentials or permits . . ." Officer Brooks stopped the truck because "[he] just didn't recognize the markings or didn't know who it was, and to the best of [his] knowledge, [he had] never stopped it before, so [he] stopped it to do an inspection."

After stopping the truck, Officer Brooks asked the truck's driver, Cesar Delgado (Cesar),[1] for his driver's license, registration permits, shipping papers, and log book. Cesar did not respond to Officer Brooks' questions regarding the truck's cargo. Instead, Delgado "stepped through the sleeper curtains . . . and stated that they were hauling speakers." Delgado confirmed that he was the truck's owner and driver.

When reviewing Cesar's log books, Officer Brooks observed that Cesar "only had two days logged," although commercial truck drivers are "required to have the day that they're operating on and seven previous days of log to show . . . what they've been doing in the past eight-day period." Cesar "only had the day that [Officer Brooks] stopped him on and the previous day." Cesar's log books violated the applicable regulations. Officer Brooks noticed additional discrepan-

---

[1]Cesar Delgado is Appellant's brother. To avoid confusion, we refer to Appellant Modesto Delgado as Delgado, and his brother as Cesar.

cies between Cesar's and Delgado's log books regarding the hours on-duty.

According to Officer Brooks, Cesar confirmed that he started the trip in Phoenix, Arizona, as reflected in Cesar's log books. However, Delgado's log books indicated that the load was picked up in Otay Mesa, California, and "[t]he shipping papers showed San Diego, California." Delgado's log book also reflected that Cesar was the co-driver in California. Officer Brooks testified that Delgado's log book "appeared to be in order." However, Officer Brooks was uncertain "how [Cesar] got to Phoenix, Arizona, since he lived in the same place that [Delgado] did."

Officer Brooks also discovered that Cesar had a disqualified California driver's license, which violated Missouri's regulations and vehicle code.

Officer Brooks asked Cesar whether the truck contained the required fire extinguisher and reflective triangles. Cesar "got out [of the truck] and tried to open the side box to show [Officer Brooks] the fire extinguisher and triangles," but was unable to open the door. Delgado told Officer Brooks that "he could unlock that door from the inside. . . . And he stepped across and asked [Officer Brooks] to step back and shut the driver's door first." Officer Brooks found this unusual, because "[Officer Brooks] couldn't imagine why [Delgado] had to shut that door before he handed [Officer Brooks] . . . the fire extinguisher and triangles."

When Delgado unlocked the side door, Officer Brooks "saw the fire extinguisher that was laying [sic] there and [he] leaned up there to see that it was charged." Delgado then "slammed or let the bunk down pretty hard," which Officer Brooks thought "was a little odd."

Officer Brooks testified that "this just didn't seem to appear to be a normal trucking operation." He contacted a state

trooper because Officer Brooks "saw some indicators that [he] had seen in years past that [he had] been trained in that may be some suspicious activity . . . and because Officer Brooks was not allowed to search or seize." Additionally, Officer Brooks "never did get an answer from [Cesar or Delgado] when definitely [Cesar] got in the truck." "It appeared to [Officer Brooks] that something . . . was out of the ordinary. Something wasn't right. So, [he] called [the state trooper] to come and investigate."

Officer Brooks "showed [Sergeant McMullin] the bills and the log books and something didn't match, and one driver said he got in in the Phoenix area, and the other one had left at the same address or the same town that both drivers stated on their log — or their driver's license . . ." Officer Brooks also informed Sergeant McMullin of the three violations Officer Brooks had found. Finally, Officer Brooks informed Sergeant McMullin that Delgado's slamming down the bunk bed "was very suspicious. It was kind of out of the ordinary and it wasn't normal."

The three violations found by Officer Brooks were a light that was out; the incomplete entries in Cesar's log book; and Cesar's invalid driver's license. Officer Brooks concluded that the violations did not warrant a citation. However, having false log books was a misdemeanor in Missouri.

Sergeant Jack McMullin, a state trooper for the Missouri State Highway Patrol, testified that state troopers have "more authority in the sense of arrest" than commercial vehicle officers (CVOs). According to Sergeant McMullin, he is contacted by CVOs when there is suspected criminal activity.

Sergeant McMullin acknowledged that CVOs call him "because they suspect[ ] drug trafficking." However, Officer Brooks did not tell Sergeant McMullin "that he suspected that this was a drug courier truck." According to Sergeant McMullin, Officer Brooks and his partner contacted him "[d]ue to

their concern about entries in the log book and responses they had got when asked questions about the entries in the log book." Sergeant McMullin was also made aware of Cesar's invalid driver's license. In addition, the log books were "indicators that led [them] to believe there was possible criminal activity." The CVOs relayed that Cesar and Delgado "were nervous." The CVOs never told Sergeant McMullin that they were not going to issue a citation.

After he spoke with Officer Brooks, Sergeant McMullin asked Delgado to exit the truck. Sergeant McMullin inquired about the discrepancies in the log books, and "the Phoenix deal." Delgado responded that "they were in Phoenix, but they were there just for a short while and that they remained in the truck. They didn't even get out." Sergeant McMullin did not "get an explanation that satisfactorily explained why there were discrepancies." Sergeant McMullin testified that his suspicions were based on "[t]he log book, the demeanor of the two individuals, the situation itself . . ."

Sergeant McMullin received Delgado's consent to search the truck. While searching the truck, Sergeant McMullin found a suitcase containing "two empty duffle bags." Sergeant McMullin believed that the empty duffle bags were unusual because, in his experience, "these were used to bring drugs or money into the vehicle." Sergeant McMullin also "located a false wall at the front of the sleeper . . ." Sergeant McMullin "lifted the lid [and] saw the drugs inside . . ." Forty-two packages of cocaine, weighing a total of 41.99 kg., were seized.

Delgado denied giving Sergeant McMullin consent to search the truck. Delgado also testified that Cesar got into the truck at his house in Colton, California, not in Arizona.

Delgado was charged with conspiracy to distribute cocaine and possession of cocaine with the intent to distribute, and tried in the Southern District of California. The district court

denied Delgado's motion to suppress evidence relating to the cocaine discovered in Delgado's truck. The court also denied Delgado's motion for reconsideration.

During Delgado's trial, Officer Marvin Ringgold, a Springfield, Missouri police officer, testified that he served as a liaison to the Drug Enforcement Administration. After being advised of his rights, Delgado agreed to be interviewed by Officer Ringgold. According to Officer Ringgold, Delgado stated that "he picked [the cocaine] up in Southern California and [was] taking [the cocaine] to Philadelphia, Pennsylvania. Delgado specified that he picked up the cocaine in San Ysidro, California, based on instructions from an individual named "Sanchotina." Delgado "admit[ted] that he knew that the cocaine was in his truck," and that Sanchotina was going to pay Delgado ten thousand dollars for its delivery to Philadelphia.[2]

The district court denied Delgado's motion for judgment of acquittal based on improper venue. The jury found Delgado "guilty of possession of cocaine with intent to distribute . . ." However, the jury was unable to reach a verdict on the conspiracy charge.

The district court sentenced Delgado to forty-six months imprisonment, and three years of supervised release. Delgado filed a timely notice of appeal.

## II.   STANDARDS OF REVIEW

"We review de novo the denial of a motion to suppress, while the underlying factual findings are reviewed for clear error." *United States v. Snipe*, 515 F.3d 947, 950 (9th Cir. 2008) (citations and alteration omitted).

---

[2]The prosecution and defense stipulated that the forty-two packages found in Delgado's truck contained 41.99 kilograms of cocaine.

"We determine jurisdiction and venue issues *de novo*." *United States v. Lee*, 472 F.3d 638, 641 (9th Cir. 2006) (citations omitted).

## III.  DISCUSSION

### A.  Missouri's Inspection Statute

Delgado contends that, because commercial trucking is not a pervasively regulated industry, Missouri's inspection statute violates the Fourth Amendment and fails to satisfy the requirements established in *Burger*.[3]

[1] "As a general rule, searches and seizures violate the Fourth Amendment unless they are based on probable cause and executed pursuant to a valid search warrant." *United States v. 4,432 Mastercases of Cigarettes, More or Less*, 448

---

[3]In *Burger*, the United States Supreme Court held that automobile junkyards are closely regulated industries subject to warrantless inspections. 482 U.S. at 703-04. "This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* at 702 (citations and internal quotation marks omitted). "Second, the warrantless inspections must be necessary to further the regulatory scheme." *Id.* (citation, alteration, and internal quotation marks omitted). "Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* at 703 (citations, alterations, and internal quotation marks omitted). "To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope." *Id.* (citations and internal quotation marks omitted).

F.3d 1168, 1176 (9th Cir. 2006) (citation omitted). "The protection against unreasonable searches and seizures extends to commercial premises . . ." *Id.* (citation omitted). "The United States Supreme Court, however, has carved out a limited number of contexts within which a warrant is not required. Administrative searches of closely regulated industries are one such exception and may be conducted without a warrant, so long as they meet certain standards of reasonableness." *Id.* (citation and internal quotation marks omitted). "We do not require a warrant in such situations because the federal regulatory presence is sufficiently comprehensive and defined that the owner of the commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* (citation and internal quotation marks omitted).

**[2]** For the stop of Delgado's truck to be a permissible administrative search, we must determine that commercial trucking is a pervasively regulated industry. *See id.* We have not extensively addressed the regulatory status of the commercial trucking industry.[4] However, the First, Fifth, Sixth, Eighth, and Tenth Circuits have concluded that commercial trucking is a pervasively regulated industry under *Burger. See United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004); *United States v. Castelo*, 415 F.3d 407, 410 (5th Cir. 2005); *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001); *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991); *United States v. Mendoza-Gonzalez*, 363 F.3d

---

[4]In other Fourth Amendment contexts, we have recognized that commercial trucking is a pervasively regulated industry. In upholding drug testing regulations for commercial drivers, we observed that "[t]he privacy expectations of commercial truck drivers are markedly less than those of the public in general. The trucking industry is highly regulated and drivers have long been subjected to federal regulation of their qualifications." *Int'l Bhd. of Teamsters v. Dep't of Transp.*, 932 F.2d 1292, 1300 (9th Cir. 1991), *as amended* (citation omitted). Although demonstrative of the highly regulated nature of commercial trucking, this precedent does not address searches conducted pursuant to state inspection statutes.

788, 794 (8th Cir. 2004); *United States v. Mitchell*, 518 F.3d 740, 751 (10th Cir. 2008).

[3] We similarly conclude that commercial trucking is a pervasively regulated industry. Commercial trucking is subject to extensive federal regulation. *See, e.g.*, 49 U.S.C. § 31142; 49 C.F.R. § 391.11; 49 C.F.R. § 391.15; 49 C.F.R. § 395.3; 49 C.F.R. § 395.8. Numerous states also impose substantial regulatory and inspection standards for commercial vehicles. *See, e.g.*, Ariz. Rev. Stat. Ann. § 41-2066(A)(4); Cal. Veh. Code § 2813; Haw. Rev. Stat. § 286-209(a); Mont. Code Ann. § 61-10-141(1)(a); Nev. Rev. Stat. § 581.057(4); Or. Rev. Stat. § 825.250(1); Wash. Rev. Code § 46.32.010(2). Thus, *Burger* provides the appropriate analytical framework because "the myriad federal and state statutes that govern commercial trucking place it squarely within the class of industries to which *Burger* applies." *Castelo*, 415 F.3d at 410 (citation omitted).[5]

Under *Burger*, Missouri's warrantless inspections of commercial vehicles survive Fourth Amendment scrutiny if "1) the underlying regulatory scheme advances a substantial government interest; 2) warrantless inspections are necessary to further the regulatory scheme; and 3) the inspection program provides a constitutionally adequate substitute for a warrant." *4,432 Mastercases of Cigarettes*, 448 F.3d at 1179 (citations and internal quotation marks omitted).

---

[5]Delgado maintains that, because commercial trucking is not a pervasively regulated industry, the search of the truck is controlled by *Delaware v. Prouse*, 440 U.S. 648 (1979). In *Fort*, the Fifth Circuit "reject[ed] [the appellant's] contention that *Prouse* forbids random, suspicionless stops and inspections of commercial trucks. The concerns that informed the analysis in *Prouse* have less applicability in the context of statutory or regulatory inspections in the pervasively regulated industry of commercial trucking." *Fort*, 248 F.3d at 481. We also conclude that *Prouse* is inapposite.

**[4]** Although not extensively considered by our court, other circuit courts are in accord that warrantless inspections of commercial trucks are necessary and serve a substantial governmental interest. *See Fort*, 248 F.3d at 481 ("Commercial trucks pass quickly through states and out of the jurisdictions of the enforcement agencies. Because of the transitory nature of the commercial trucking industry, we conclude that the need for warrantless stops and inspections is even more compelling than the warrantless inspections of automobile junkyards upheld in *Burger*.") (citations and footnote reference omitted); *Maldonado*, 356 F.3d at 136 ("[B]ecause violations of the regulatory scheme often are not apparent to a patrolling officer, inspections are sometimes the only way in which violations can be discovered. We conclude, therefore, that effective enforcement of the regulatory regime would be impossible in the absence of impromptu inspections."); *Dominguez-Prieto*, 923 F.2d at 469 ("Like the stolen cars and automobile parts which pass quickly through an automobile junkyard, trucks pass quickly through states and out of the jurisdictions of the enforcement agencies; the facts presented here in support of warrantless inspections are more compelling than those present in *Burger*.").

**[5]** Given this weight of authority, we similarly conclude that the warrantless inspection of commercial vehicles "advances a substantial government interest," and is "necessary to further the regulatory scheme." *4,432 Mastercases of Cigarettes*, 448 F.3d at 1179 (citations and internal quotation marks omitted).

Delgado also posits that the Missouri statute is an inadequate substitute for a warrant because it provides enforcement officers with unfettered discretion in conducting inspections without observing a regulatory violation. However, Delgado's argument imports into the *Burger* analysis a requirement that *Burger* does not mandate. In *Burger*, the approved statute did not limit the inspectors' discretion only to commercial premises with observable violations. *See Burger*, 482 U.S. at 694

n.1.[6] The Supreme Court observed that "[i]t was unclear from the record why, on that particular day, Burger's junkyard was selected for inspection. The junkyards designated for inspection apparently were selected from a list of such businesses compiled by New York City police detectives." *Id.* at 694 n.2 (citations omitted). Despite the lack of clarity, the statute still provided a proper warrant substitute because it "inform[ed] the operator of a vehicle dismantling business that inspections will be made on a regular basis. Thus, the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." *Id.* at 711 (citations omitted). Additionally, "the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises." *Id.* at 711-12 (citation and internal quotation marks omitted). *Burger*, therefore, does not support Delgado's proposition that the enforcement officers must observe a violation before stopping a commercial vehicle for inspection. *Cf. Maldonado*, 356 F.3d at 136 ("[B]ecause violations of the regulatory scheme often are not apparent to a patrolling officer, inspections are sometimes the only way in which violations can be discovered.").

[6] We conclude that the Missouri statute provides a similar permissible warrant substitute. The inspection statute is limited to commercial vehicles. Mo. Stat. Ann. § 304.230.4(2)(2004). The enforcement inspectors "determine compliance with commercial vehicle laws, rules, and regulations, [and] compliance with the provisions of sections

---

[6]The statute mandated that "[u]pon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises." *Burger*, 482 U.S. at 694 n.1.

303.024 and 303.025, RSMo . . ." *Id.* The Missouri statute, therefore, informs operators of commercial vehicles that they are subject to inspection. As in *Burger*, the permissible scope is limited to the enforcement officers' inspections of commercial vehicles for regulatory compliance. *See Burger*, 482 U.S. at 711-12; *see also Castelo*, 415 F.3d at 411; *Fort*, 248 F.3d at 482.[7]

[7] We, therefore, conclude that Officer Brooks' stop of Delgado's truck pursuant to the Missouri inspection statute did not violate the Fourth Amendment.[8]

---

[7]Unlike the statute in *Burger*, the Missouri statute does not designate when the enforcement officers may conduct inspections. *See Burger*, 482 U.S. at 711. However, as the Sixth Circuit observed, "[s]uch a limitation would, of course, render the entire inspection scheme unworkable and meaningless. Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time. Thus, this difference between the statutes is inconsequential." *Dominguez-Prieto*, 923 F.2d at 470.

[8]Delgado faults the Missouri statute because it does not require the enforcement officers to have a reasonable belief of a violation similar to the Tennessee statute in *Dominguez-Prieto*. However, in *Dominguez-Prieto*, the Sixth Circuit opined that the validity of the Tennessee statute was bolstered because "the inspection scheme in *Burger* required *no level of suspicion* while the Tennessee inspection scheme requires a reasonable belief that a violation is occurring." *Dominguez-Prieto*, 923 F.2d at 469 (internal quotation marks omitted) (emphasis added). The Sixth Circuit did not establish that reasonable belief of a violation was a requirement under *Burger*. Delgado's reliance on *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978), is also misplaced. In that case, the Supreme Court considered whether warrantless searches of work areas conducted pursuant to the Occupational Safety and Health Act of 1970 (OSHA) comported with the Fourth Amendment. *Marshall*, 436 U.S. at 309, 311. The Supreme Court reasoned that "the Secretary attempts to support a conclusion that *all businesses involved in interstate commerce* have long been subjected to close supervision of employee safety and health conditions. . . . It is quite unconvincing to argue that the imposition of minimum wages and maximum hours on employers who contracted with the Government under the Walsh-Healey Act prepared the *entirety of American interstate commerce* for regulation of working conditions to the minutest detail." *Id.* at 314

## B.    Sergeant McMullin's Search of Delgado's Truck

Delgado contends that Officer Brooks did not have reasonable suspicion to contact Sergeant McMullin based solely on the regulatory violations that Officer Brooks uncovered. Delgado asserts that "[Officer Brooks] simply told Sergeant McMullin that the log books had some errors . . ."

The record reflects a contrary conclusion. Sergeant McMullin testified that Officer Brooks discussed "some discrepancies with the log books"; Cesar's disqualified driver's license; "and [that the CVOs] were having trouble making a determination of where this one individual had got in the truck, and they were getting what they thought [were] deceptive answers."

Additionally, Officer Brooks testified that he "told [Sergeant McMullin] that [he] couldn't quite figure out the combination on the log book, they seemed to be hiding something. It appeared to be more than maybe just . . . driving too long or falsifying the log, that something wasn't exactly right, didn't appear to be a normal operation." Officer Brooks was unable to reconcile Cesar's and Delgado's stories. Officer Brooks informed his partner that he "thought that something wasn't exactly right, and they didn't seem to want to answer any more questions. . . . [Officer Brooks] told [his partner that he] was going to call one of the troopers out to let him talk to them, see what he thought about the situation." Officer

_____

(emphasis added). However, the Missouri inspection regime does not implicate "all businesses involved in interstate commerce" or "the entirety of American interstate commerce." *See id.* Instead, inspections are limited to commercial vehicles. Mo. Ann. Stat. § 304.230.4(2)(2004). Although commercial vehicles constitute a broad category, commercial vehicles, unlike "the work area of any employment facility within [OSHA's] jurisdiction," *Marshall*, 436 U.S. at 309, are heavily regulated, thus justifying warrantless inspections. *See Mitchell*, 518 F.3d at 751; *see also Castelo*, 415 F.3d at 410.

Brooks also became suspicious when Delgado closed the driver's door after entering the sleeping compartment.

Officer Brooks contacted Sergeant McMullin based on his experience regarding "suspicious activity." Sergeant McMullin verified that CVOs contact him when there is suspected criminal activity. Although Officer Brooks did not tell Sergeant McMullin that Delgado had a drug courier truck, Sergeant McMullin confirmed that CVOs contact him "because they suspected drug trafficking." According to Sergeant McMullin, the log books were "indicators that led [the officers] to believe there was possible criminal activity."

Delgado, therefore, fails to provide factual or legal support for his premise that Officer Brooks was required to have reasonable suspicion before contacting Sergeant McMullin. The record reflects that Officer Brooks acted on more than just the log book discrepancies, and instead suspected that, based on his training and observations of Delgado's behavior, Delgado was engaged in potential criminal activity. Officer Brooks, therefore, had a reasonable basis to contact Sergeant McMullin. *See Dominguez-Prieto*, 923 F.2d at 470.

**[8]** In any event, pursuant to Missouri law, Sergeant McMullin was authorized to inspect commercial vehicles based on a statute governing a pervasively regulated industry. *See, e.g.*, *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. 1994) (en banc) ("Initial discovery of violations of state and federal laws and regulations prompted the inspectors to conduct a more thorough search and contact Trooper Henson, who possessed independent authority to inspect the [defendant's] vehicle under state law."). Thus, Sergeant McMullin had an independent basis to question Delgado about the log books, irrespective of Officer Brooks' actions. *See id.*

**[9]** Sergeant McMullin was not prohibited from questioning Delgado about matters unrelated to the administrative inspection, and asking for Delgado's consent to a search. *See*

*United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007) ("[M]ere police questioning does not constitute a seizure unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop.") (citation and internal quotation marks omitted); *see also United States v. Turvin*, 517 F.3d 1097, 1099-1100 (9th Cir. 2008).[9] Sergeant McMullin, therefore, had a valid basis to search Delgado's truck, given Delgado's consent. *See United States v. McWeeney*, 454 F.3d 1030, 1033-34 (9th Cir. 2006) ("Consensual searches are allowed because it is reasonable for law enforcement agents to conduct a search after receiving consent.") (citation omitted).

[10] We conclude that Sergeant McMullin's questioning of Delgado and the search of Delgado's truck comported with the Fourth Amendment. *See Castelo*, 415 F.3d at 412; *Dominguez-Prieto*, 923 F.2d at 470.

## C.   Venue in the Southern District of California

Delgado contends that the government failed to establish that venue was proper in the Southern District of California.

In analyzing venue issues, we must identify "the nature of the crime alleged . . ." *United States v. Hernandez*, 189 F.3d 785, 788 (9th Cir. 1999) (citation omitted). Delgado was con-

---

[9]Delgado's reliance on *United States v. $124,570 U.S. Currency*, 873 F.2d 1240 (9th Cir. 1989), and *United States v. Bulacan*, 156 F.3d 963 (9th Cir. 1998), *as amended*, is misplaced. Although these cases involved administrative searches, they dealt with security screenings at federal buildings and airports, not inspections of pervasively regulated industries. *See Bulacan*, 156 F.3d at 965-66; *$124,570 U.S. Currency*, 873 F.2d at 1241. For pervasively regulated industries, the *Burger* Court reasoned that "[t]he discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal or the administrative scheme suspect." *Burger*, 482 U.S. at 716 (citation omitted). Thus, to accept Delgado's premise, we would have to unreasonably limit the inspection statute to regulatory violations, despite Delgado's suspicious behavior and Delgado's consent to a search of the truck.

victed of possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and aiding and abetting in violation of 18 U.S.C. § 2.

**[11]** "Possession is a continuing crime, for which venue properly lies in any district in which the possession took place." *United States v. Valdez-Santos*, 457 F.3d 1044, 1046 (9th Cir. 2006) (citation omitted). Additionally, "[w]e have upheld venue in a district in which individuals other than the defendant possessed drugs, so long as the defendant aided and abetted that possession by his participation in the chain of possession in another district." *Id.* "The government bears the burden of establishing venue by a preponderance of the evidence." *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002), *as amended* (citation omitted).

**[12]** Delgado asserts that the government relied exclusively on Delgado's confession to establish venue, without proffering independent corroborating evidence of its veracity. "Although the government may rely on a defendant's confession to meet its burden of proof, it has nevertheless been long established that, in order to serve as the basis for conviction, the government must also adduce some independent corroborating evidence." *United States v. Corona-Garcia*, 210 F.3d 973, 978 (9th Cir. 2000) (citation omitted). "Although independent evidence is not necessary to establish the whole of the *corpus delicti*, such evidence must support the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.* (citation, alteration, and internal quotation marks omitted). "[A]lthough a confession must be corroborated by independent evidence, the corroboration need not independently establish any element beyond a reasonable doubt, but must merely fortify the truth of the confession." *United States v. Lopez-Garcia*, 683 F.2d 1226, 1228 (9th Cir. 1982) (citation, alteration, and internal quotation marks omitted).[10]

---

[10]We require the corroboration of confessions to prove the core offense. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 591 (9th Cir. 1992)

**[13]** In his statement to Officer Ringgold, Delgado explained that he picked up the cocaine in San Ysidro, California pursuant to Sanchotina's instructions, and that he knew that the cocaine was in the truck. However, the government did not rely exclusively on Delgado's statements. The shipping records reflected that the load was picked up in southern California. Delgado's log books also indicated that the trip started in San Diego, California "when the load was picked up." In addition, the government was able to conduct a controlled delivery of the cocaine based on Delgado's statement. We, therefore, conclude that Delgado's confession was sufficiently corroborated, as the government presented "evidence that fortifies, augments, or supports it—from which a jury may infer that the defendant's confession was a trustworthy admission to core conduct that actually occurred." *Corona-Garcia*, 210 F.3d at 979 (footnote reference omitted).

**[14]** Delgado further maintains that venue was improper because there was no evidence that the cocaine was actually placed into his truck in San Ysidro, California. However, "direct proof of venue is not necessary where circumstantial evidence in the record as a whole supports the inference that the crime was committed in the district where venue was laid." *Pace*, 314 F.3d at 349 (citation and alteration omitted). Given Delgado's statements, the log books, and the shipping records, we conclude that the government satisfied its burden

("[T]he state no longer need introduce independent, tangible evidence supporting every element of the *corpus delicti*. Instead, the state is required to support independently only the gravamen of the offense—the existence of the injury that forms the core of the offense and a link to a criminal actor—with tangible evidence."). However, "[w]hile venue presents a question of fact and must be proved by the government, it is not an essential element of the offense. . . . Thus, the failure to establish venue does not go to guilt or innocence." *United States v. Kaytso*, 868 F.2d 1020, 1021 (9th Cir. 1989), *as amended* (citation omitted). It appears that Delgado's venue argument places a higher burden on the government than warranted by our precedent. In any event, we conclude that Delgado's confession was sufficiently corroborated.

of proving venue by a preponderance of the evidence. *See United States v. Childs*, 5 F.3d 1328, 1332 (9th Cir. 1993).[11]

## IV. CONCLUSION

The district court committed no error when it denied Delgado's motion to suppress the drugs discovered in Delgado's commercial vehicle. The warrantless administrative search did not violate the Fourth Amendment. Venue in the Southern District of California was established by evidence in the record other than Delgado's statement of the origin of the trip.

**AFFIRMED.**

---

[11]Delgado's reliance on *United States v. Corona*, 34 F.3d 876 (9th Cir. 1994), is misplaced. In *Corona*, the defendant was convicted in Nevada of cocaine offenses, although "[t]he actual distribution . . . took place in California." *Id.* at 878. The defendant "never set foot" in Nevada. *Id.* at 879. In contrast, Delgado's statement, the log books, and shipping records support the inference that he was present in southern California.