**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 18-4703**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee

     v.

JAISON R. FELICIANA,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, District Judge.  (1:18-cr-00113-AJT-JFA-1)

Argued:  December 11, 2019               Decided:  September 11, 2020

Before KING, HARRIS, and RUSHING, Circuit Judges.

Reversed, vacated, and remanded by published opinion.  Judge Rushing wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:**  Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Aidan Taft Grano, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Maria N. Jacob, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, Allison J. Garnett, Special Assistant United States Attorney, Troy Edwards, Jr., Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

RUSHING, Circuit Judge:

A United States Park Police Officer stopped Jaison R. Feliciana for driving his employer's delivery truck on the George Washington Memorial Parkway (Parkway), where commercial vehicles require permits. Feliciana did not possess the requisite permit, but he did possess marijuana; he was charged for both violations. After the magistrate judge denied his motion to suppress, Feliciana pleaded guilty to operating a commercial vehicle without a permit and entered a conditional guilty plea to the marijuana charge, reserving the right to appeal the denial of his suppression motion. The district court affirmed. We conclude that the Government has not carried its burden to show that the officer had reasonable suspicion to stop Feliciana or that the stop was a valid administrative inspection. We therefore reverse the suppression ruling, vacate Feliciana's marijuana conviction, and remand.

I.

On the morning of October 28, 2017, Feliciana was driving a bakery delivery truck on the Parkway. Officer Jonathan Alto of the U.S. Park Police observed the small box truck and believed it was a commercial vehicle, which are prohibited from driving on the Parkway without a permit. Based solely on his observation of "a commercial truck on the Parkway," Officer Alto stopped the truck. J.A. 60–61.

Officer Alto informed Feliciana that he stopped him for driving a commercial vehicle on the Parkway, and Feliciana responded that he had thought that prohibition applied only to larger trucks. While talking to Feliciana, Officer Alto smelled marijuana. He mentioned the odor to Feliciana, who admitted that he had smoked marijuana earlier in

2

the day on his way to work. Officer Alto requested to see the permit allowing Feliciana to operate a commercial vehicle on the Parkway, but Feliciana could not produce a permit and appeared nervous. Officer Alto instructed Feliciana to exit the vehicle and observed what appeared to be a pipe on the floorboard. When he asked Feliciana if the pipe was for marijuana, Feliciana lunged toward the truck, at which point Officer Alto restrained him in handcuffs. Ultimately, after searching the truck and Feliciana, Officer Alto found a small bag of marijuana in Feliciana's shoe.

Feliciana was charged with possession of marijuana and operating a commercial vehicle on the Parkway without a permit, and he filed a motion to suppress the evidence obtained in the traffic stop. The magistrate judge conducted a suppression hearing and denied the motion. Feliciana then pleaded guilty but reserved the right to appeal the suppression ruling. *See* 18 U.S.C. § 3401 (authorizing magistrate judges to try misdemeanors). On appeal, the district court held that the traffic stop was based on reasonable suspicion that Feliciana was operating a commercial vehicle on a restricted highway without a permit and that the stop was permissible as a warrantless administrative inspection under *New York v. Burger*, 482 U.S. 691 (1987), because the Parkway is a pervasively regulated federal enclave. *See* 18 U.S.C. § 3402 (authorizing appeal to the district court). The court further held that Officer Alto had probable cause to search Feliciana's shoe.

Feliciana now appeals to our Court. We review the factual findings underlying a motion to suppress for clear error and the legal determinations de novo. *United States v. Davis*, 690 F.3d 226, 233 (4th Cir. 2012). Because the magistrate judge denied the

suppression motion, we review the evidence in the light most favorable to the government. *Id.*

## II.

A traffic stop constitutes a seizure under the Fourth Amendment and thus must be justified by reasonable suspicion of criminal activity or some other exception to the generally applicable warrant requirement. *See Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The government bears the burden to justify a warrantless seizure. *See United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013). Here, the Government contends that the traffic stop was supported by reasonable suspicion that Feliciana lacked the required permit and, alternatively, that the stop was a permissible administrative inspection under *Burger*.

## A.

Reasonable suspicion to initiate a brief investigative traffic stop requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Glover*, 140 S. Ct. at 1187 (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)). Although it is a "commonsense, nontechnical" standard, *Ornelas v. United States*, 517 U.S. 690, 698 (1996), to support a finding of reasonable suspicion "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance,'" *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). In practice, this typically means that "an officer's articulated

4

facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008).

Officer Alto testified that he stopped Feliciana's vehicle because "[i]t was a commercial truck on the Parkway." J.A. 60; *see also* J.A. 61 ("I advised Mr. Feliciana the reason he was stopped was for having a commercial vehicle on the Park Roadway."). National Park Service (NPS) regulations prohibit "commercial vehicles"—which include but are not limited to "trucks, station wagons, pickups, passenger cars or other vehicles when used in transporting movable property for a fee or profit . . . or used as an incident to providing services to another person, or used in connection with any business"—from driving on the Parkway except "when authorized by a permit" or other exception. 36 C.F.R. §§ 5.6(a), 7.96(f). The superintendent of a park area "shall issue permits" for commercial vehicles to drive on park roads "when such use is necessary for access to private lands situated within or adjacent to the park area," and the superintendent also "may grant permission to use park roads" in emergencies. *Id.* § 5.6(b), (c); *see also id.* § 1.6(a) (authorizing the superintendent to issue permits). Use of park roads is also authorized when "in connection with the operation of the park area." *Id.* § 5.6(b).

Officer Alto did not articulate any reason to suspect that Feliciana did not possess the requisite permit to drive a commercial vehicle on the Parkway. The entire factual basis he offered for conducting the traffic stop was that he saw a vehicle requiring a permit on the Parkway. But that fact by itself is wholly innocent. The Government elicited no

5

testimony concerning why Officer Alto or any other reasonable officer would think that Feliciana's truck in particular lacked a permit.

On appeal, the Government argues that permits are rarely granted therefore it is reasonable to suspect that any commercial vehicle on the Parkway lacks a permit. Without passing upon the theoretical viability of that argument, we find no evidence in the record to support it. The record is bereft of information about how many permits are issued, how many permit requests are denied, what types of vehicles typically receive permits, or even how many regulations authorize the issuance of permits. While the government is not required to rule out the possibility of innocent conduct to meet the reasonable suspicion standard, *Prado Navarette v. California*, 572 U.S. 393, 403 (2014), it must articulate some particularized and objective basis for suspecting illegality.

We agree with Feliciana that this case is governed by *Delaware v. Prouse*, 440 U.S. 648 (1979). There, a patrolman stopped a vehicle on a public highway solely to check the driver's license and registration, without having observed any traffic violation or suspicious activity or any other reason to believe the car was being driven contrary to law. *Id.* at 650–651. The Supreme Court held that, absent reasonable suspicion that a motorist is unlicensed or an automobile is unregistered or that either is otherwise subject to seizure for a violation of law, "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.* at 663. So too here. Absent articulable suspicion that Feliciana lacked the required permit, Officer Alto was not entitled to stop Feliciana's vehicle at his discretion to check whether Feliciana possessed a permit.

The Government directs our attention to *Kansas v. Glover*, 140 S. Ct. 1183 (2020), but that case provides no support for the stop here. In *Glover*, a patrolman stopped the defendant's pickup truck after a record check revealed that the driver's license of the truck's registered owner had been revoked. *Id.* at 1187. Without any facts indicating otherwise, the patrolman assumed that the truck's driver was the registered owner. The Supreme Court held that these facts gave rise to reasonable suspicion that the driver was operating the truck without a license because the officer could draw the commonsense inference that the registered owner was likely the driver of the vehicle. *Id.* at 1188–1190. Here, unlike in *Glover*, Officer Alto offered no reason to believe Feliciana was operating his truck without a permit. The mere existence of the permit requirement does not, by itself, amount to reasonable suspicion that a particular driver failed to satisfy that requirement. And unlike the inference in *Glover*, the incidence of permitted and unpermitted commercial vehicles on the Parkway is not a matter of common sense, even to local citizens and judges. So appeals to common sense cannot fill the evidentiary gap here.

Alternatively, the Government contends that the grammatical structure of the regulations allows us to assume that most commercial vehicles on the Parkway lack a permit. The Government notes that Sections 5.6(b) and 7.96(f) are written as general prohibitions with a permit exception. *See*, *e.g.*, 36 C.F.R. § 7.96(f) ("Commercial vehicles . . . are prohibited on park roads and bridges except . . . when authorized by a permit . . . ."). From this, the Government argues that a law enforcement officer possesses reasonable suspicion of illegal activity whenever he observes a commercial vehicle on park roads. But

7

the regulations' structure cannot bear the evidentiary load the Government would place on them. License and permit schemes may commonly be written in the negative—consider the Virginia and Delaware driver's license statutes, which provide that "[n]o person . . . shall drive any motor vehicle on any highway" without first obtaining a driver's license. Va. Code § 46.2-300; *see* Del. Code tit. 21, § 2701(a); *see also* Va. Code § 46.2-341.7 ("No person shall drive a commercial motor vehicle in the Commonwealth unless he has been issued a commercial driver's license . . . ."). Under the Government's logic, the structure of those statutes alone provides law enforcement reasonable suspicion to conduct discretionary spot checks to ensure drivers possess a valid driver's license. That reasoning directly undermines *Prouse*, where the Court held that spot checks to ensure compliance with Delaware's driver's license statute violated the Fourth Amendment. *See Prouse*, 440 U.S. at 659. We cannot infer from a permitting scheme's mere existence that a particular driver lacks the required permit.

None of this leaves an officer powerless to stop a commercial vehicle on the Parkway if the officer actually possesses reasonable suspicion that the vehicle lacks the required permit. Officers often base their suspicion in part on their practical experience and specialized knowledge, which we credit when assessing the constitutionality of their actions. *See*, *e.g.*, *McCoy*, 513 F.3d at 413–414; *United States v. McHugh*, 349 Fed. App. 824, 827–828 (4th Cir. 2009). Indeed, we can imagine facts to which an officer might testify that would support a particularized objective suspicion that a certain commercial vehicle lacks the required permit. But before we can credit officer experience and

8

knowledge, "officers must apply their experience so that the courts can make informed decisions on whether their suspicions are reasonable." *Williams*, 808 F.3d at 253.

The district court here assumed that Officer Alto was "familiar with what private lands could only be accessed through the GW Parkway and the frequency with which a special permit would be issued for such access," as well as with "the likelihood that a commercial vehicle requiring a special permit was attempting to access private lands from GW Parkway that are not otherwise accessible." J.A. 203. This assumption was not based on any facts in the record and, in any event, it is too general to fill the evidentiary gap. Even if Officer Alto had testified he was familiar with the frequency of commercial vehicle permits (which he did not), his testimony would not assist the Government if, for example, he would have gone on to testify that permits were frequently granted to local shops like the bakery for which Feliciana was driving. The Government did not elicit any testimony about these details from Officer Alto, and we cannot assume his answers. As we have said in a similar context, "[w]e do not question the experience of [this] officer[], but the prosecution is obliged to present evidence articulating reasonable suspicion." *Williams*, 808 F.3d at 253. The Government failed to carry its burden here.

B.

In the alternative, the Government argues that Officer Alto did not need reasonable suspicion for the seizure because he stopped Feliciana to conduct a permissible warrantless administrative inspection. A warrantless inspection of a pervasively regulated business may be reasonable under the Fourth Amendment if three criteria are met. "First, there must be a substantial government interest that informs the regulatory scheme pursuant to which

9

the inspection is made." *Burger*, 482 U.S. at 702 (internal quotation marks omitted). "Second, the warrantless inspections must be necessary to further the regulatory scheme." *Id.* (internal quotation marks and brackets omitted). Third, "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant," that is, it must "advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope," and it must "limit the discretion of the inspecting officers." *Id.* at 703 (internal quotation marks and brackets omitted).

As these criteria indicate, we must first identify the regulatory scheme that authorized Officer Alto to stop Feliciana's vehicle without a warrant or suspicion before we can evaluate whether that scheme and its execution here satisfy the Fourth Amendment. The Government relies on the Federal Motor Carrier Safety Administration (FMCSA) regulations governing the commercial trucking industry. In particular, 49 C.F.R. § 396.9(a) provides: "Every special agent of the [FMCSA] . . . is authorized to enter upon and perform inspections of a motor carrier's vehicles in operation and intermodal equipment in operation." The regulation goes on to require that the inspector use a particular report to record the results of motor vehicle and intermodal equipment inspections, which report covers equipment such as the parking brake, steering mechanism, lighting devices and reflectors, tires, horn, wheels and rims, and so forth. 49 C.F.R. §§ 396.9(b), 396.11. The driver must then deliver the report to the motor carrier or equipment provider, who must examine the report and correct violations or defects. *Id.* § 396.9(d).

10

While Section 396.9(a) appears to authorize warrantless inspections of a motor carrier's vehicles in operation, the problem for the Government is that Officer Alto did not stop Feliciana pursuant to this or any other FMCSA regulation. He never suggested as much to Feliciana during the stop or at the suppression hearing, and the Government does not argue otherwise on appeal. As the Government admits in its brief, Officer Alto stopped Feliciana "to determine whether [he] had the requisite permits to drive on the Parkway," as required by the NPS regulations. Response Br. 26.

The Government observes that other courts of appeals, citing the FMCSA regulations and state statutes, have held that commercial trucking is a pervasively regulated industry subject to *Burger*'s administrative inspection exception. *See United States v. Delgado*, 545 F.3d 1195, 1202 (9th Cir. 2008); *United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004); *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1210 (10th Cir. 2001); *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001); *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991). That may be true, but here it puts the cart before the horse. In every case on which the Government relies, the officer actually stopped or searched the defendant's truck as part of an administrative inspection pursuant to statutory or regulatory authority. *See Delgado*, 545 F.3d at 1198; *Maldonado*, 356 F.3d at 132; *Vasquez-Castillo*, 258 F.3d at 1209; *Fort*, 248 F.3d at 478; *Dominguez-Prieto*, 923 F.2d at 466. That is not the case here. Our analysis therefore ends before we reach the question whether commercial trucking is a pervasively regulated industry, because Officer Alto was not acting pursuant to commercial trucking regulations when he stopped Feliciana's vehicle.

11

In other words, the Government cannot justify the constitutionality of this traffic stop by relying on a regulatory scheme that was not the basis for the stop. Doing so would render *Burger*'s criteria for assessing constitutionality a farce. Each of those criteria is rightly applied to "the regulatory scheme pursuant to which the inspection is made." *Burger*, 482 U.S. at 702; *see id.* at 703 (focusing on the scope and limits of the particular statute authorizing the inspection); *LeSueur-Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264–265 (4th Cir. 2012) (same). For example, *Burger* asks whether "the statute's inspection program" "advise[s] the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope" and whether it "limit[s] the discretion of the inspecting officers." *Burger*, 482 U.S. at 703 (internal quotation marks omitted). It makes no sense for us to assess whether Section 369.9(a) and related FMCSA regulations satisfy these criteria in the abstract when they were not the basis for the stop here.

Furthermore, an inspection pursuant to Section 369.9(a) may be conducted only by a "special agent of the FMCSA," and nothing in the record indicates that Officer Alto is such an agent. 49 C.F.R. § 396.9(a); *see id.* Ch. III, Subch. B, App. B(3) ("Special agents are [FMCSA] employees who are identified by credentials issued by the FMCSA authorizing them to enforce [relevant statutes and regulations]."); *see*, *e.g.*, *Maldonado*, 356 F.3d at 132 (noting that the patrolman in that case was also an agent of the FMCSA authorized to conduct inspections under these regulations and to carry the requisite inspection forms). Officer Alto testified that he was "certified as a federal commercial vehicle inspector," J.A. 59, but the Government does not suggest that credential, or any

12

other, qualified Officer Alto as a special agent of the FMCSA authorized to conduct inspections pursuant to these regulations. And, despite the Government's argument to the contrary, it should go without saying that the officer conducting an administrative inspection must be authorized by the relevant statute or regulation to do so. *See Burger*, 482 U.S. at 717 (noting that the state statute permitted "police officers . . . to conduct the . . . inspection" at issue). The Government has failed to carry its burden to show that Officer Alto was so authorized.

Unlike the Government, the district court focused its *Burger* analysis on NPS regulations, finding that the Parkway "constitutes a 'pervasively regulated' federal enclave subject to specific rules and regulations." J.A. 202. Setting aside the question whether a federal enclave could qualify as a "pervasively regulated business" under *Burger*'s framework for analyzing warrantless inspections of commercial premises, 482 U.S. at 702, neither the district court nor the Government has identified any regulation authorizing a warrantless stop for a permit check under NPS regulations. The district court noted that state traffic laws apply on the Parkway and that a Virginia regulation authorizes "[l]aw-enforcement officers specifically designated by the superintendent [of the Virginia State Police]" to inspect motor carrier vehicles and intermodal equipment in operation, incorporating Section 396.9(a). 19 Va. Admin. Code § 30-20-230; *see id.* § 30-20-10 (defining "superintendent"). The Government, however, disavows reliance on state law, Response Br. 24 n.10, and use of this state regulation suffers from infirmities similar to those associated with Section 396.9(a): there is no evidence Officer Alto was designated by the superintendent of the Virginia State Police to conduct such inspections or that those

13

inspections authorize enforcement of the federal NPS permit requirement. The Government cites a statute generally authorizing park police officers to investigate federal offenses and make arrests without warrants for federal offenses committed in their presence, *see* 54 U.S.C. § 102701(a)(2), but that provision plainly does not authorize stops or inspections to enforce park regulations without warrants or suspicion.

Nor can the combination of these regulatory schemes remedy their individual deficits. The Government's effort to combine the FMCSA regulations and NPS regulations for its *Burger* analysis does not solve the basic problem that it has failed to identify any statute or regulation "pursuant to which the [stop] [wa]s made." *Burger*, 482 U.S. at 702. Moreover, the NPS permit regulations are detached from the government's interest in regulating commercial trucking. Commercial trucks are swept within the ambit of the permit regulations via the category of "commercial vehicles," which also applies nonexclusively to "station wagons, pickups, passenger cars or other vehicles." 36 C.F.R. § 5.6(b). Sections 5.6(b) and 7.96(f) are no more commercial trucking regulations than are any generally applicable traffic laws. In these circumstances, we reject the Government's effort to graft the two regulatory schemes together in order to satisfy *Burger*'s criteria.

Indeed, even if we accepted the Government's regulatory mash-up, it would fail *Burger*'s third requirement that the program "provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 703 (internal quotation marks omitted). One of the basic functions of a warrant is to advise the property owner that the search is being conducted pursuant to the law and has a properly defined scope. *Id.* To perform this function, the statute or regulation "must be sufficiently comprehensive and defined that the

14

owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 703 (internal quotation marks omitted); *see LeSueur-Richmond Slate Corp.*, 666 F.3d at 265. Even considering together all of the various regulations cited by the Government, the driver of a commercial vehicle on the Parkway would have no notice that he could be stopped for a suspicionless permit check—the specific purpose of the stop at issue here. The regulations thus are no substitute for a warrant in these circumstances.

## III.

In sum, the Government has failed to show that Officer Alto possessed reasonable suspicion of illegality when he stopped Feliciana's truck or that he acted pursuant to an administrative inspection scheme in conducting the stop. Because the initial traffic stop violated the Fourth Amendment, any evidence obtained from it, including the marijuana found in Feliciana's shoe, should have been suppressed. *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005); *Taylor v. Alabama*, 457 U.S. 687, 694 (1982). We therefore reverse the district court's denial of Feliciana's suppression motion, vacate his possession conviction, and remand for further proceedings consistent with this opinion.

*REVERSED, VACATED, AND REMANDED*

15