947 A.2d 674 (2008)
400 N.J. Super. 376
STATE of New Jersey, Plaintiff-Appellant,
v.
Anthony HEWITT and Dervan Facey, Defendants-Respondents.
Docket No. A-3648-05T3, A-4094-05T3
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 2008.
Decided May 19, 2008.
*675 Robert D. Bernardi, Burlington County Prosecutor, attorney for appellant (Alexis R. Agre, Assistant Prosecutor, of counsel and on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent Anthony Hewitt (Robert L. Sloan, Assistant Deputy Public Defender, of counsel and on the brief).
Hagner & Zohlman, attorneys for respondent Dervan Facey (John A. Zohlman, III, Cherry Hill, on the brief).
Before Judges SKILLMAN, YANNOTTI and LeWINN.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The issue presented by this appeal is whether a police officer who makes observations during a routine safety inspection of a commercial truck that reasonably lead him to believe it contains a hidden compartment containing contraband must obtain a search warrant before undertaking to confirm the existence of the hidden compartment and determine its contents. We conclude that a search of an area of a commercial truck that is within the scope of a proper safety inspection may be conducted without a warrant even though this area is concealed within a hidden compartment and the officer's purpose in continuing the search is to obtain evidence of a *676 crime rather than to complete the safety inspection.
Federal and state statutes and administrative regulations authorize safety inspections of commercial trucks. 49 U.S.C.A. § 31142; 49 U.S.C.A. § 31136; 49 C.F.R. §§ 396.9, 396.17; N.J.S.A. 39:5B-32; N.J.A.C. 13:60-2.1. In New Jersey, such inspections are conducted by the State Police Commercial Carrier Safety Inspection Unit.
On November 5, 2005, a member of that unit, Trooper Wayne Hancock, stopped defendants' tractor-trailer on the New Jersey Turnpike in Mount Laurel Township to conduct a safety inspection. Defendant Hewitt was driving the tractor and defendant Facey was in the back in a "sleeper."
When Hancock approached the truck, he noticed that Hewitt's hands were "visibly shaken" and that he appeared nervous. Hancock examined Hewitt's driver's license and the "paperwork" for the truck and then directed Hewitt to drive to a nearby rest area in order to conduct a North American Standard Level II safety inspection. A police officer conducting such an inspection may examine not only the paperwork for the truck but also make a visual inspection of the truck to check for any safety violations and of the truck's contents to ensure that they are properly secured.
After Hancock escorted Hewitt to the rest area, he was joined by another member of his safety inspection unit, Trooper Andy Eaton. A third trooper, who was not a member of the unit, was also present.
Hancock began the Level II inspection by conducting a more intensive review of the paperwork for the truck and entering relevant data into his computer. This review revealed information regarding defendants' itinerary that increased Hancock's initial suspicions based on Hewitt's nervousness when first stopped. Hancock noticed that the truck had remained in Phoenix, Arizona, for five days even though it was the peak of the growing season  a time of year when truckers have no difficulty picking up loads of produce such as the melons defendants were transporting. When Hancock asked defendants separately about the reason for their long layover in Phoenix, they gave conflicting answers. Hewitt said the refrigeration unit in their truck had broken down, while Facey said they could not find a load to transport. Hancock also testified that defendants had driven the truck fewer hours per day than normal and that they had taken an indirect route from Phoenix to their destination in New York.
When Hancock completed his review of the paperwork for the truck, he conducted the visual inspection of the truck and its contents required in a Level II safety inspection. Hancock noted a number of violations, including a tail light and brake light out on the back of the trailer and an unsecured fire extinguisher. When he opened the back door of the trailer to inspect its contents, he found that the "load jack" that secures the load was not in the proper position and that three of the pallets on which crates of melons had been placed were tipped over against the side of the trailer.
Hancock then crawled over the top of the crates to the front of the trailer. He noticed that the trailer did not have a front drain, as most trailers do, to channel water that accumulates from the refrigeration system to the outside of the truck. Hancock also noticed that the floor "ribs" that run from the back to the front of the trailer continued underneath the front wall of the trailer rather than, as in most trailers, stopping before the wall. In addition, Hancock observed what appeared to be *677 new panels secured by new rivets and caulk at the front of the trailer. Based on his training and experience, Hancock concluded that there was probably a hidden compartment at the front of the trailer. He also knew that such compartments are used to transport money, explosives, people or narcotics.
At this point, Hancock got out of the trailer and told his partner, Trooper Eaton, what he had observed. The troopers then undertook to confirm the existence of the hidden compartment. They measured the inside and outside of the trailer and discovered a four-foot discrepancy. Trooper Eaton also used a density meter, which indicated a significant difference between the density of the contents in the front four feet and the rest of the trailer.
Eaton next used a fiber optic scope to look into the hidden compartment through a drain hole, which revealed packages wrapped in yellow and red cellophane with numbers written on them. The troopers knew from their experience that such packaging is commonly used to transport marijuana.
After making these observations, the troopers arrested defendants. Thereafter, defendants' tractor-trailer was towed to a State Police barracks where, with Hewitt's assistance, the troopers gained access to the secret compartment containing the marijuana.[1]
Defendants were indicted for first-degree possession of marijuana with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(10)(a); second-degree conspiracy to possess marijuana with the intent to distribute, in violation of N.J.S.A. 2C:5-2, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(10)(a); and possession of marijuana, in violation of N.J.S.A. 2C:35-10(a)(3).
Defendants filed a motion to suppress the evidence found in the search of the trailer's hidden compartment. The trial court held an evidentiary hearing at which Trooper Hancock testified to the facts previously summarized. Facey testified for the defense that he heard one of the other troopers state to Hancock, "you need a search warrant[.]"
The trial court concluded in a written opinion that the safety inspection of defendants' truck was transformed into a search for evidence of a crime when Trooper Hancock discovered what appeared to be a hidden compartment at the front of the trailer, and therefore, the troopers should have obtained a warrant before taking measurements and using scientific devices to confirm the existence of the compartment and determine its contents. In reaching this conclusion, the court stated:
The purpose of the Federal Motor Carrier Safety Administration Program's Commercial Carrier Safety Inspections is to perform random truck stops to ensure compliance with safety standards. The inspection in this case morphed from ensuring compliance with safety standards to focusing on a segregated compartment within the trailer that had no effect on vehicle safety. . . .
. . . .
The issue in the present case is whether the measurements taken with the highly sophisticated equipment namely the density meter and the fiber optic scope to determine the existence of the secret compartment and its contents were made pursuant to and in enforcement of the regulatory scheme devised by the State of New Jersey. N.J. Admin. Cd. Tit. 13 § 60-2.1, provides the authority to conduct Level II truck inspections of the type undertaken by *678 Trooper Hancock. It calls for an inspection of the following: 1) the driver's license, medical examination and waiver, 2) driver's log for abnormalities, 3) the brake system and brake lamps, 4) emergency equipment including fire extinguishers and 5) proper blocking and bracing of cargo. Trooper Hancock exceeded that scope was evidenced by use of density meter and fiber optic scope.
We granted the State's motion for leave to appeal from the order granting defendants' motion to suppress. The State argues that the troopers' search of the hidden compartment did not exceed the scope of the regulatory inspection of defendants' trailer. In the alternative, the State argues that the search was valid under the automobile exception to the warrant requirement.
We conclude that the search of the hidden compartment was within the scope of the regulatory search of the trailer, and therefore, we reverse the order suppressing the evidence against defendants. This conclusion makes it unnecessary to consider the applicability of the automobile exception.
Under the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, "[a] warrantless search [or seizure] is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Moore, 181 N.J. 40, 44, 853 A.2d 903 (2004) (quoting State v. Cooke, 163 N.J. 657, 664, 751 A.2d 92 (2000)). One such exception is for an administrative search of a place of business operations of a highly or pervasively regulated industry. See New York v. Burger, 482 U.S. 691, 702-03, 107 S.Ct. 2636, 2643-44, 96 L.Ed.2d 601, 613-14 (1987); N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 545-46, 701 A.2d 1243 (1997); State v. Turcotte, 239 N.J.Super. 285, 291-97, 571 A.2d 305 (App.Div.1990).
This exception applies only if three criteria are satisfied:
First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. . . .
Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." . . .
Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope."
[Burger, supra, 482 U.S. at 702-03, 107 S.Ct. at 2644, 96 L.Ed.2d at 614 (citations omitted).]
Every federal circuit court of appeals that has considered the issue has concluded that commercial trucking is a highly regulated industry, and therefore, the government may establish a regulatory program for administrative searches of commercial trucks without a warrant. See, e.g., United States v. Gwathney, 465 F.3d *679 1133, 1138-40 (10th Cir.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 2151, 167 L.Ed.2d 879 (2007); United States v. Mendoza-Gonzalez, 363 F.3d 788, 793-94 (8th Cir.2004); United States v. Maldonado, 356 F.3d 130, 134-36 (1st Cir.2004); United States v. Fort, 248 F.3d 475, 480-82 (5th Cir.2001); United States v. Dominguez-Prieto, 923 F.2d 464, 468-70 (6th Cir.), cert. denied, 500 U.S. 936, 111 S.Ct. 2063, 114 L.Ed.2d 468 (1991).
Defendants do not question the validity of the regulatory program under which their truck was stopped and subjected to a Level II safety inspection. Nor do defendants dispute that Trooper Hancock's purpose in stopping their truck was to conduct such an inspection. Defendants' only argument, which the trial court adopted, is that the permissible safety inspection of their truck was transformed into an impermissible warrantless search when Trooper Hancock observed what appeared to be the outer wall of a hidden compartment he suspected was being used to transport contraband and decided to conduct a search to confirm or dispel that suspicion.
The constitutionality of a search and seizure is determined by whether a law enforcement officer's actions were "objectively reasonable, without regard to his or her underlying motives or intent." State v. Bruzzese, 94 N.J. 210, 219, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). "[T]he issue is not [the investigating officer's] state of mind, but the objective effect of his actions." Bond v. United States, 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365, 370 (2000); accord State v. O'Neal, 190 N.J. 601, 614, 921 A.2d 1079 (2007). Consequently, a properly authorized administrative search of a place of business of a highly regulated industry is not unconstitutional simply because the officer conducting the search has reason to believe the search may reveal evidence of a crime. See United States v. Villamonte-Marquez, 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577, 77 L.Ed.2d 22, 28 (1983); State v. Rednor, 203 N.J.Super. 503, 508-09, 497 A.2d 544 (App. Div.1985). Therefore, even if Trooper Hancock had suspected when he began his safety inspection, based on Hewitt's nervousness, the questions raised by the truck's itinerary and defendants' conflicting answers to his questions, that the trailer was being used to transport contraband, and his real purpose in conducting the inspection was to find that contraband, this underlying motive would not have made the administrative search unconstitutional.
Trooper Hancock's otherwise constitutional administrative search was not rendered unconstitutional because defendants or others acting in concert with them constructed a hidden compartment at the front of the trailer to conceal drugs. The administrative regulations under which the search was conducted authorize inspection of every part of the trailer to verify proper securing of the cargo. See 49 C.F.R. § 393.102 to § 393.106; N.J.A.C. 13:60-2.1; see also Commercial Vehicle Safety Alliance, Understanding the North American Standard Inspection Program (2006), available at http://www.cvsa.org/programs /documents/inspectionprogrambrochure.pdf; United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir.2001). Thus, a trucker cannot create an area of his truck that is exempt from inspection simply by constructing a hidden compartment. See United States v. Johnson, 408 F.3d 1313, 1322 (10th Cir.), cert. denied, 546 U.S. 951, 126 S.Ct. 458, 163 L.Ed.2d 348 (2005); Mendoza-Gonzalez, supra, 363 F.3d at 795; Vasquez-Castillo, supra, 258 F.3d at 1211-12. Therefore, the entire truck, including the hidden compartment, was within the spatial scope of the search *680 that the applicable administrative regulations authorized the troopers to conduct.
We also note that although Trooper Hancock acknowledged that his purpose in searching the hidden compartment was to determine whether it contained criminal contraband, a search of that area would have been required in any event in order to complete a safety inspection of the trailer. If cargo in such a compartment is not properly secured, it creates the same risk of instability of the trailer as improperly secured cargo in the main compartment. In fact, one of the primary purposes of a safety inspection of a trailer is to ensure that any loose cargo does not puncture the front of the trailer if the truck stops suddenly. See United States v. Burch, 153 F.3d 1140, 1142 n. 2 (10th Cir.1998). Consequently, the trooper's search for criminal contraband was not materially different from the search of the hidden compartment that would have been required to complete the safety inspection.
In concluding that the troopers' search of the hidden compartment in defendants' trailer was invalid, the trial court relied primarily upon United States v. Knight, 306 F.3d 534 (8th Cir.2002), which involved a search of the driver's briefcase during a commercial truck safety inspection. The court in Knight held that a search of a briefcase containing the driver's personal belongings "quite obviously exceeded the authority vested in [the inspecting officer] by the North America Standard Inspection Program, and thus . . . exceeded the scope of a constitutionally permissible regulatory search." Id. at 536.
The hidden compartment in the trailer defendants were operating was not part of their "personal belongings" in which they had a reasonable expectation of privacy. Instead, it was an integral part of a commercial truck that defendants "[could not] help but be aware . . . [would be] subject to periodic inspections undertaken for specific purposes[,]" in this case, highway safety. Burger, supra, 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614. For this reason, unlike the briefcase search involved in Knight, the troopers' search of the hidden compartment in defendants' trailer did not exceed the permissible scope of the regulatory search.
To uphold an administrative search conducted under a valid regulatory program, the court must find that the search was "carefully limited in time, place, and scope." Burger, supra, 482 U.S. at 703, 107 S.Ct. at 2644, 96 L.Ed.2d at 614 (quoting United States v. Biswell, 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87, 92 (1972)). In this case, there is no indication that the troopers' use of scientific devices to verify the existence of the hidden compartment and determine its contents significantly increased the "time" required for a Level II safety inspection; the "place" of this search was the same rest area at which the routine safety inspection of defendants' truck had started; and the "scope" of the search was limited to the four corners of the trailer that the applicable regulations authorize a law enforcement officer conducting a safety inspection to examine. Therefore, we conclude that the troopers' warrantless search of the trailer, including their search of the hidden compartment they discovered during the course of a routine safety inspection, constituted a valid administrative search under the criteria set forth in Burger.
Accordingly, the order suppressing the evidence obtained in that search is reversed.
NOTES
[1] The State's brief indicates that the marijuana weighed a total of 1,400 pounds.