997 A.2d 1107 (2010)
414 N.J. Super. 219
STATE of New Jersey, Plaintiff-Respondent,
v.
Ender F. POMPA, Defendant-Appellant.
DOCKET NO. A-0139-08T4.
Superior Court of New Jersey, Appellate Division.
Submitted June 9, 2010.
Decided July 2, 2010.
*1109 Yvonne Smith Segars, Public Defender, for appellant (Kevin G. Byrnes, Designated Counsel, of counsel and on the brief).
Thomas S. Ferguson, Warren County Prosecutor, for respondent (Dit Mosco, Assistant Prosecutor, of counsel and on the brief).
Before Judges AXELRAD, FISHER and SAPP-PETERSON.
The opinion of the court was delivered by
FISHER, J.A.D.
Defendant was convicted of various drug offenses after more than thirty pounds of marijuana were seized from the sleeper cabin of his tractor trailer. Among other things, defendant argues the judge erred in denying his motion to suppress the seized evidence. We conclude the closely regulated business exception permitted a warrantless administrative inspection of certain areas of the tractor trailer, but the search turned unlawful when it progressed into unregulated areas without the exigent circumstances required by State v. Pena-Flores, 198 N.J. 6, 28, 965 A.2d 114 (2009). We reverse the order denying the suppression of evidence and, as a result, vacate the judgment of conviction and remand for a new trial.

I
The record reveals that at approximately 8:30 a.m. on January 28, 2007, Trooper Michael Budrewicz stopped a tractor trailer driven by defendant on Interstate Highway 78 in Greenwich Township. Trooper Budrewicz was suspicious because it appeared there was tampering with the vehicle USDOT number;[1] when he entered the number into his computer, it did not correspond with the company name on the *1110 side of the vehicle. Trooper Budrewicz activated his sirens and directed defendant to pull over.
Shortly after Trooper Budrewicz exited his vehicle, defendant emerged from the cab, nervously waving his keys and requesting the Trooper to look inside the trailer. The Trooper signaled defendant to remain inside the cab.
Once defendant was back inside the cab, Trooper Budrewicz approached the driver's side door to speak with him. As he stepped up on the running board, the Trooper could feel it was extremely cold inside the cab, as it was outside, and the windows were noticeably foggy, yet it did not appear defendant was using the heat or defroster. In addition, Trooper Budrewicz detected an "overwhelming" odor of air fresheners and counted roughly twenty of them hanging throughout the cab.[2] He also observed that defendant appeared nervous and, when asked for his driving documents, defendant turned the truck radio up "extremely loud."
After fumbling with his paperwork for a few seconds, defendant provided his driver's license, social security card, permanent residence card, and log book,[3] but was unable to produce a bill of lading. According to Trooper Budrewicz, defendant was the first of approximately 2,000 truck drivers he had stopped who could not produce a bill of lading. Trooper Budrewicz returned to his cruiser and began reviewing defendant's paperwork but, once again, defendant exited the cab and tried to approach. The Trooper again ordered defendant to remain in his vehicle and defendant complied. The log book indicated defendant had driven more than fourteen consecutive hours of drive time without taking at least ten hours of rest in violation of federal regulations.[4] At this point, based on defendant's "nervousness," "the ridiculous odors of air freshener," defendant's repeated attempts to exit the cab, defendant's eagerness "to show . . . the trailer," and the irregularities in the log book, Trooper Budrewicz decided to perform a North American Standard Level II safety inspection of defendant's vehicle.[5]
Trooper Budrewicz began his Level II inspection by sitting in the driver's seat of the cab and checking the safety belts. He testified that, upon entering the cab, and apparently no longer affected by the overwhelming air freshener odor that had raised his suspicions, the Trooper "very quick[ly]" smelled "a strong odor of raw marijuana" coming from the sleeper cabin.[6] He entered the sleeper cabin, "looked *1111 back toward the sleeper bunk," and then into "the closet that didn't have a door on it." Inside the closet, Trooper Budrewicz found a black duffel bag and "stuck [his] nose down to the black duffel ba[g] without even touching it," whereupon, according to his testimony, he could smell marijuana inside.[7] Trooper Budrewicz opened the bag and found twenty to twenty-five hermetically sealed freezer bags filled with what appeared to be marijuana.
After making this discovery, the Trooper arrested defendant, advised him of his Miranda rights,[8] searched him for contraband, and radioed for backup. When backup arrived, Trooper Budrewicz performed a second warrantless search of the vehicle, finding inside the same closet another duffel bag and what was referred to as a rectangular "genesis box."[9] He also found two more bags on top of and underneath defendant's bed. All of these containers held what appeared to be marijuana.
The truck was impounded and defendant was transported back to State Police Barracks to be processed. Trooper Mike DelRio read defendant his Miranda rights, but did not interrogate him, asking only for defendant's personal information, such as his name, date of birth, residence, and occupation.[10] Nevertheless, as Trooper DelRio requested this information, defendant volunteered that the marijuana in the sleeper cabin was placed there by a man he met in Florida. Defendant also told Trooper DelRio he agreed to transport the bags to Connecticut in exchange for $6,000; defendant did not admit he knew the bags were filled with marijuana.
Chemical lab tests confirmed the substance seized from defendant's truck was marijuana.

II
Defendant was indicted for first-degree possession of marijuana with the intent to distribute, N.J.S.A. 2C:35-5(a)(1); N.J.S.A. 2C:35-5(b)(10)(a); second-degree conspiracy to possess marijuana with the intent to distribute, N.J.S.A. 2C:5-2; N.J.S.A. 2C:35-5(b)(10)(a); and fourth-degree possession of marijuana, N.J.S.A. 2C:35-10(a)(3). Before trial, defendant moved to suppress the evidence seized from the sleeper cabin. Following a four-day hearing, the trial judge denied defendant's motion for reasons set forth in a written decision.
Defendant was tried before a jury over the course of six days in March and April 2008 and found guilty on all counts. The trial judge denied defendant's post-trial motions. At sentencing, the judge merged the convictions and imposed a ten-year *1112 prison term with a four-year period of parole ineligibility.
Defendant appealed, arguing, among other things:
THE DEFENDANT'S RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES AS GUARANTEED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 7 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE UNLAWFUL SEARCH AND SEIZURE OF THE PERSONAL PROPERTY CONTAINED IN A COMMERCIAL VEHICLE.
Defendant raised numerous other issues. Because we agree defendant's suppression motion should have been granted, we need not reach the other issues posed.

III
Under both the federal and state constitutions, a warrantless search is presumptively invalid unless it "`falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Pineiro, 181 N.J. 13, 19, 853 A.2d 887 (2004) (quoting State v. Maryland, 167 N.J. 471, 482, 771 A.2d 1220 (2001)). Because of our strong preference for warrants issued by impartial magistrates, the State bears the burden of proving by a preponderance of the evidence that a warrantless search falls within an established exception. State v. Elders, 192 N.J. 224, 246, 927 A.2d 1250 (2007).
In denying defendant's motion, the trial judge found defendant's constitutional rights were not violated because the warrantless search was permitted either by the closely regulated business exception or by the presence of probable cause based upon the Trooper's assertion that he smelled marijuana in the sleeper cabin.
For the reasons that follow, we reverse. The Trooper was lawfully permitted to conduct an administrative inspection of the vehicle based on the closely regulated business exception. However, the warrantless search became impermissible once it exceeded the "spatial scope" authorized by regulation. State v. Hewitt, 400 N.J.Super. 376, 386, 947 A.2d 674 (App.Div.2008). Accordingly, we hold that the Trooper was not lawfully permitted to exceed the scope of the administrative inspection absent a warrant or compliance with the standards recently outlined in Pena-Flores regarding motor vehicle searches. There, the Court canvassed the case law that had developed over decades, 198 N.J. at 21-28, 965 A.2d 114, and concluded that a warrantless motor vehicle search is permitted only when the stop is unexpected, the police possess probable cause that the vehicle contains contraband or evidence of a crime, and exigent circumstances make it impracticable to seek a warrant, id. at 28, 965 A.2d 114. Although the first two elements were found here, the record does not support a finding of exigent circumstances.

A
The closely regulated business exception has "generally been applied to businesses with a `long tradition of close government supervision.'" N.J. Transit PBA Local 304 v. N.J. Transit Corp., 151 N.J. 531, 546, 701 A.2d 1243 (1997) (quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 313, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305, 312 (1978)). It is based on the understanding that individuals engaged in pervasively regulated enterprises have a diminished expectation of privacy in their affairs. New York v. Burger, 482 U.S. 691, 700, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601, 612 (1987); Donovan v. Dewey, 452 U.S. 594, 598-99, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262, 268-69 (1981).
*1113 Warrantless inspections of closely regulated businesses, however, must be reasonable. N.J. Transit, supra, 151 N.J. at 545-46, 701 A.2d 1243. The test for reasonableness was announced in Burger, supra, 482 U.S. at 702-03, 107 S.Ct. at 2646, 96 L.Ed.2d at 614, and later adopted by our Supreme Court, N.J. Transit, supra, 151 N.J. at 545-46, 701 A.2d 1243. In these instances, the State must demonstrate: (1) the existence of a regulatory scheme supported by a substantial government interest; (2) the warrantless inspection will further the regulatory scheme; and (3) the individual received notice of the inspection, and the search was limited in time, place, and scope. Burger, supra, 482 U.S. at 702-03, 107 S.Ct. at 2646, 96 L.Ed.2d at 614. Ultimately, "[w]hether a search has been conducted in an unreasonable manner is a matter to be determined in the light of the circumstances of the particular case." In re Martin, 90 N.J. 295, 314 n. 9, 447 A.2d 1290 (1982).
In determining whether a business is closely regulated, the focus falls on "the pervasiveness and regularity of the . . . regulation" and its effect on a business owner's expectation of privacy. Donovan, supra, 452 U.S. at 606, 101 S.Ct. at 2542, 69 L.Ed.2d at 273. We recently held that the commercial trucking industry is closely regulated, State v. Hewitt, supra, 400 N.J.Super. at 385, 947 A.2d 674, as has every federal court that has considered this issue, see, e.g., United States v. Steed, 548 F.3d 961, 968 n. 5 (11th Cir.2008); United States v. Delgado, 545 F.3d 1195, 1201-02 (9th Cir.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1383, 173 L.Ed.2d 636 (2009); United States v. Mitchell, 518 F.3d 740, 751 (10th Cir.2008); United States v. Castelo, 415 F.3d 407, 410 (5th Cir.2005); United States v. Mendoza-Gonzalez, 363 F.3d 788, 794 (8th Cir.2004); United States v. Maldonado, 356 F.3d 130, 135 (1st Cir. 2004); United States v. Dominguez-Prieto, 923 F.2d 464, 468 (6th Cir.), cert. denied, 500 U.S. 936, 111 S.Ct. 2063, 114 L.Ed.2d 468 (1991).
For decades, tractor trailers have been subject to extensive federal regulation. See 49 C.F.R. §§ 300-399; see also N.J.S.A. 39:5B-32; N.J.A.C. 13:60-2.1. These regulations govern a vast array of topics, including, among other things: hours of service, 49 C.F.R. § 395; necessary parts and accessories, 49 C.F.R. § 393; driver qualifications, 49 C.F.R. § 391; record retention, 49 C.F.R. § 379; and licensing, 49 C.F.R. § 383. The regulations also purport to authorize warrantless roadside inspections of commercial vehicles to ensure compliance with safety standards. 49 C.F.R. § 396.9.
These regulations contain specifications for sleeper cabins. For example, the regulations contain length, width, and shape requirements for the sleeper cabin and demand that the cabin have at least two access points so that emergency exits are not unduly hindered. 49 C.F.R. § 393.76. The regulations impose bedding requirements and provide that all sleeper cabins not contained within the driver compartment must contain communication devices between the sleeper cabin and the cockpit. Ibid. Thus, truckers may reasonably anticipate administrative inspections for the purpose of ensuring compliance.
We recently considered the application of the Burger test to an administrative inspection. In Hewitt, police stopped a truck for a safety inspection during which an officer suspected the trailer contained a hidden compartment. 400 N.J.Super. at 381-82, 947 A.2d 674. With a density meter the officer determined the existence of a hidden compartment and with a fiber optic scope he peered inside it. Id. at 382, 947 A.2d 674. The officer was thus able to observe within the hidden compartment a large number of cellophane wrapped packages, which he believed contained contraband. *1114 Ibid. The defendant was placed under arrest and his truck impounded; the officers opened the hidden compartment and searched the boxes within, all without first obtaining a warrant. Ibid.
In upholding the search, we relied upon the closely regulated industry exception and concluded "[t]he administrative regulations under which the search was conducted authorize inspection of every part of the trailer to verify proper securing of the cargo." Id. at 386, 947 A.2d 674. We found no reason to give the hidden compartment any enhanced privacy treatment because safety issues could arise from improperly secured cargo within the secret chamber. Ibid. And, although the officer had "acknowledged that his purpose in searching the hidden compartment was to determine whether it contained criminal contraband," we held an officer's intent will not invalidate an otherwise permissible administrative search. Id. at 386-87, 947 A.2d 674. Thus, like our federal counterparts, we have upheld warrantless administrative inspections of the trailer portion of the vehicle. See Steed, supra, 548 F.3d at 966-75; Maldonado, supra, 356 F.3d at 134-36; United States v. Vasquez-Castillo, 258 F.3d 1207, 1210-13 (10th Cir.2001); Dominguez-Prieto, supra, 923 F.2d at 467-70.
The circumstances presented here differ because the Trooper's search was not concerned with the trailer portion of the vehicle, but focused instead on the sleeper cabin and, even more specifically, a closet within the sleeper cabin and closed containers within that closet. These areas were certainly more private than a cargo hold or, as in Hewitt, a secret compartment attached to a cargo hold. Accord United States v. Knight, 306 F.3d 534, 535 (8th Cir.2002) (concluding that the closely regulated business exception does not permit the opening of a truck driver's briefcase without a warrant during an administrative inspection).
Few cases have considered whether the scope of an administrative inspection could lawfully encompass a search of a tractor trailer's sleeper cabin. In Mendoza-Gonzalez, supra, 363 F.3d at 791-92, the defendant's tractor trailer was stopped by police who then performed a Level II safety inspection during which one officer entered the sleeper cabin. When the officer observed the beds did not have proper restraints, he opened the storage compartment underneath to see whether the restraints had fallen into a storage compartment. Id. at 792. Inside one of the storage compartments, the officer found sealed packages containing marijuana. Ibid. In finding this search to be reasonable, the court of appeals held the officer was acting within the scope of the administrative inspection when he entered the sleeper cabin to check for safety restraints. Id. at 794. And, because the officer reasonably believed the belts might have fallen into the storage compartment beneath the bed, the court of appeals sustained as reasonable the search for the belts in those compartments. Ibid.[11]
New Jersey certainly has an interest in guaranteeing the safety of drivers on its roadways and, to that end, warrantless administrative inspections further that interest by ensuring that the largest vehicles on our roads are safe for transit and in compliance with established regulations. We thus conclude the Trooper was *1115 entitled to conduct an administrative inspection of defendant's vehicle pursuant to applicable regulations and the purposes for which those regulations were adopted. Ultimately, the legitimacy of a warrantless administrative inspection "is a matter to be determined in the light of the circumstances of the particular case." Martin, supra, 90 N.J. at 314 n. 9, 447 A.2d 1290. In deferring to the trial judge's findings, we conclude that the Level II inspection was permitted and authorized entry into the sleeper cabin since the federal regulations extend that far.
However, the regulations do not encompass closets or personal belongings located inside a sleeper cabin and, as a result, the closely regulated business exception cannot form the basis for a warrantless search into those areas. Even if we assume Trooper Budrewicz entered the sleeper cabin for the purpose of conducting a safety check, as in Mendoza-Gonzalez, supra, 363 F.3d at 791-94, the search inside the cabin's closet and the opening of the baggage within that closet exceeded the letter and intent of the regulations applicable to sleeper cabins. In short, the search of the cabin's closet exceeded "the spatial scope" of the administrative inspection. Hewitt, supra, 400 N.J.Super. at 386, 947 A.2d 674. Unlike the officer's search of the sleeper cabin in Mendoza-Gonzalez, the search here came untethered from the authority to conduct the administrative inspection because there was no regulatory reason for the Trooper's search in defendant's closet or the duffel bag therein. To be lawful, the search into the closet and the duffel bag required some other constitutional underpinning.

B
The State argues that even if the closely regulated business exception did not give Trooper Budrewicz the right to search through defendant's closet and containers within that closet, the warrantless search may be upheld because the Trooper obtained sufficient information during the administrative inspection to have probable cause to search the closet and its contents. That is, the State argues that where the boundaries of the administrative inspection ended probable cause began, and that probable cause was formed when the Trooper detected a strong odor of unburnt marijuana. See, e.g., State v. Nishina, 175 N.J. 502, 515-16, 816 A.2d 153 (2003). This fact, along with the suspicious nature of the cab's many air fresheners, defendant's nervous and furtive conduct, and the irregularities in defendant's log book, according to the State, permitted the continued warrantless search. We reject this contention because it is based on a misunderstanding of the elements necessary to permit a lawful warrantless motor vehicle search.
Our Supreme Court recently held in Pena-Flores that "the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant." 198 N.J. at 28, 965 A.2d 114. There is no dispute about the first two prongs. The stop was unexpected, and we assume the Trooper's detection of an odor of unburnt marijuana supported the finding of probable cause.[12] *1116 The State, however, failed to demonstrate the presence of exigent circumstances.
When considering whether an exigency existed to permit a warrantless search, a variety of factors must be considered:
the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.
[Id. at 29, 965 A.2d 114.]
The State had the burden of demonstrating exigent circumstances, id. at 25, 965 A.2d 114, and its failure in this regard is revealed by the Trooper's testimony. During cross-examination at the suppression hearing, Trooper Budrewicz admitted defendant's vehicle was incapable of being moved because he was in possession of defendant's keys; common sense strongly suggested it was not likely another person with another set of keys was in the vicinity. In addition, the Trooper admitted he could have had the vehicle towed to a safe location while he applied for a warrant prior to conducting a search beyond the scope of the administrative inspection:
Q: But you could have towed [the truck] to Perryville station, secured it there, and gotten a warrant, or you could have left it there, or called a detective, or called the [prosecutor's] office and said I've got probable cause to search this thing, get me a warrant. . . .
A: I could have done that but I had plain smell.
And, when asked why he decided to search instead of first obtaining a warrant, the officer insisted: "I don't need a warrant with probable cause." Again, Pena-Flores requires more than probable cause; exigent circumstances are also required.
The State argues that an exigency existed because of "the time of day, the remote location of the stop, the number of Troopers at the scene, the discrepancy between the DOT number and the company name on the side of the truck, as well as lack of information regarding a second driver and the owner of the truck." These contentions are wanting; indeed, they actually support defendant's position. For example, the truck was stopped at 8:30 a.m., a time of day that would have made it much easier to seek a warrant than if these events occurred late at night.
Likewise, the truck was stopped on an interstate highway. Although there were *1117 likely other vehicles then passing by, the circumstances are not similar to those where a vehicle is stopped in a high crime neighborhood where the accused's confederates or others hostile to police might congregate and pose a threat. See, e.g., State v. Cooke, 163 N.J. 657, 674, 751 A.2d 92 (2000).
There was also no proof that the Trooper was outnumbered. The only persons present during the administrative inspection and the search into the sleeper cabin were the Trooper and defendant; the Trooper did not testify that he felt endangered by the one-to-one ratio of officer-to-suspect or that backup was unavailable. To the contrary, he felt no need to call for backup until after the initial search and after defendant was arrested. And there was no suggestion of a concern that evidence would be lost if the vehicle were left at that location to be searched at a later time although, again, the Trooper testified that nothing prevented the towing of the truck to a secure location.[13]

C
To summarize, we uphold the administrative inspection of the vehicle's cab as well as the Trooper's entry into the sleeper cabin for the purpose of ensuring compliance with federal regulations. We conclude, however, that the permissible administrative inspection could not validly reach into the closet of the sleeper cabin or the duffel bag found in that closet. At that moment, the search exceeded the lawful spatial scope of the administrative inspection.
In deferring to the trial judge's finding that the Trooper was able to smell raw marijuana in the sleeper cabin, we agree probable cause existed to search further into the sleeper cabin. However, in applying the requirements of Pena-Flores, mere proof of an unexpected vehicle stop and probable cause did not permit a warrantless search beyond the limits of the administrative inspection in the absence of exigent circumstances.
As a result, the evidence seized from the closet in the vehicle's cabin and the additional evidence seized without a warrant thereafter could not be lawfully used against defendant at trial.
*1118 Reversed and remanded for the entry of an order suppressing evidence and for the conducting of a new trial.
NOTES
[1] Federal regulations require that all commercial vehicles operating in interstate commerce "register with the [Federal Motor Carrier Safety Administration] and receive a USDOT number," 49 C.F.R. § 385.301, which must be displayed on the exterior of the commercial vehicle, 49 C.F.R. § 390.21(b)(2).
[2] The Trooper testified that "[t]he first thing" he noticed after ascending the running board was "a pungent smella pungent odor of air freshener coming out, overwhelming."
[3] A trucker's log book is a catalog of important information about the trip, including gas expenditures and drive time.
[4] Trooper Budrewicz also later determined defendant's gas receipts did not match the gas expenditure listings in the log book.
[5] State and federal regulations permit random warrantless safety inspections of commercial vehicles. See 49 U.S.C.A. § 31142; 49 C.F.R. §§ 396.9, 396.17; N.J.S.A. 39:5B-32; N.J.A.C. 13:60-2.1. These inspections fall into six categories, the most common of which are: Level III inspections, consisting of an examination of the driver's documentation and some of the truck's simple safety apparatuses; Level II inspections, consisting of a "walk-around driver/vehicle inspection" of nearly all "items which can be inspected without physically getting under the vehicle"; and Level I inspections, consisting of a full safety inspection, including under the truck. See http://www.fmcsa.dot.gov/safety-security/safety-initiatives/mcsap/insplevels. htm.
[6] The sleeper cabin was directly behind the driver and passenger seats. It contained a bed, which was behind a curtain, as well as a closet and small refrigerator.
[7] The Trooper testified he was able to smell raw marijuana through the duffel bag, which was zippered closed, and through the plastic Ziploc bags containing marijuana within the duffel bag. He explained this was possible because one of the Ziploc bags had "a cut in it inside the initial black duffel bag that [he] searched, and that really let the marijuana [smell] come out." Upon cross-examination, the Trooper acknowledged there were no photographs of the "slit open baggie." A State Police lab technician, who examined and catalogued the evidence, later testified that in examining the seized evidence he could not recall whether or not any of the bags were slit open.
[8] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[9] The record on appeal does not illuminate what was meant by a "genesis box." Although the trial court record contained photographs, no photographs were included in the appendices filed here. In any event, it has no bearing on the disposition of this appeal.
[10] Trooper DelRio was called in because he was proficient in Spanish, which appeared to be defendant's primary language.
[11] Delgado, supra, 545 F.3d 1195, provides no guidance as to the scope of an administrative inspection of a sleeper cabin. There, police found cocaine hidden in a secret compartment behind one of the walls in a vehicle's sleeper cabin. Id. at 1200. The search was found reasonable not because of the closely regulated business exception but because defendant consented to the search. Id. at 1205.
[12] In accepting that probable cause existed, a fact defendant does not dispute, we assume the judge found the Trooper credible even though the judge never expressly said that. The judge also never resolved questions surrounding the alleged existence of the slit-open Ziploc bag, despite its significant impact on the Trooper's credibility. The judge only stated in his written decision on this point the following:

[The Trooper's] testimony indicated that when he opened one of the duffle [sic] bags, one of the shrink-wrapped interior bags had a[t]ear which could have accounted for the strong smell of marijuana. There were several smaller, shrink-wrapped bags inside each of the duffel bags.
This [c]ourt points out that upon examination of all the bags by the lab technician, none were reported as having a tear. However, the lab technician did testify that he opened each bag to weigh the contents, and would subsequently place tape over the openings which he had made. It is very possible that in the process, tape would cover any tear that may have already been in one of the packages before that.
What the Trooper's testimony "indicated" does not make it so unless the judge found that testimony credible and, as we have noted, the judge did not say whether he found the Trooper's testimony credible. And the judge also recognized that the lab technician was unable to support the Trooper's testimony about the open bag. In addition, the judge did not say whether he found the lab technician credible, and offered only a "possible" explanation for the lack of support for the Trooper's testimony.
[13] The State seems to argue that the smell of marijuana was proof of exigent circumstances, citing State v. Birkenmeier, 185 N.J. 552, 563, 888 A.2d 1283 (2006). There, police made a stop of a vehicle based on a confidential tip that the defendant would be making a large marijuana delivery in Long Branch at a particular time. Id. at 555, 888 A.2d 1283. Events unfolded as forecasted by the informant. Id. at 556, 888 A.2d 1283. When the defendant's vehicle was stopped on its way to Long Branch, an officer saw a laundry tote bag on the seat next to defendant and smelled "a very strong odor of marijuana." Ibid. The Court stated that in "[a]pplying the case-by-case analysis required by [State v.] Dunlap[,] [185 N.J. 543, 888 A.2d 1278 (2006)] and Cooke here, there is no doubt that [the officer's] observation of the laundry tote bag on the front passenger's seat of defendant's car and detection of `a very strong odor of marijuana' sufficed to provide the probable cause and exigent circumstances needed. . . ." Id. at 563, 888 A.2d 1283. This statement hardly supports the argument that the smell of marijuana creates exigent circumstances. The Pena-Flores Court, in listing the many types of things that may be relevant to determining the presence of exigent circumstances, did not mention the odor of marijuana. 198 N.J. at 29, 965 A.2d 114. And it is difficult to accept the State's suggestion that the Court in Birkenmeier intended to find an exigency from circumstances that relate only to probable cause, particularly in a case in which the presence of exigent circumstances was not at issue. 185 N.J. at 563 n. 2, 888 A.2d 1283 (observing in a footnote that followed the sentence quoted above that "[d]efendant never challenged whether exigent circumstances existed in order to trigger the automobile exception").