**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2087-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH M. CRILLEY,

     Defendant-Appellant.

_____

Argued September 9, 2025 – Decided September 29, 2025

Before Judges Gilson, Firko and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Indictment No. 19-12-0335.

Rachel Glanz, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel Glanz, of counsel and on the briefs.)

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the brief).

PER CURIAM

Defendant Joseph M. Crilley appeals from a January 25, 2023 order denying his motion to suppress evidence of wax folds discovered by law enforcement during a warrantless search of his tow truck following a fatal accident and biofluid samples—blood and urine—obtained after issuance of a telephonic search warrant. He also challenges his two consecutive five-year prison sentences subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, following his plea to two reckless vehicular homicide and assault by auto counts.

After carefully reviewing the record in light of the arguments of the parties and the applicable law, we conclude the wax folds would have inevitably been properly seized, and the telephonic search warrant for defendant's blood and urine was supported by probable cause. Therefore, we affirm.

I.

We summarize the facts from the two-day motion to suppress hearing, at which New Jersey State Police (NJSP) Trooper James Celi and Detective Daniel Rodriguez of the NJSP Fatal Accident Investigation Unit testified. The trial court also reviewed body worn camera (BWC) videos taken from Celi, State Trooper Julio Rodriguez, Sparta Township Police Officer Lynott,[1] Sergeant

---

[1] Officer Lynott's first name is not contained in the record.

David Fritsch, and Officer Joseph Liguori,[2] which were played at the hearing, the telephonic search warrant for blood and urine samples, the search warrant, the NMS Labs toxicology report, crime scene photographs, and the New Jersey State Police Drinking Driving Report.

In the late evening of August 5, 2019, defendant was driving a 2012 Isuzu tow truck carrying two vehicles on Route 94 South in Lafayette Township. One vehicle was on the flatbed of the tow truck, and the other vehicle was being towed from the tailgate with its two front wheels raised off the surface of the road. According to eyewitnesses and the accident reconstruction report, defendant was speeding, crossed the double yellow lines onto incoming traffic on Route 94 North, and crashed into a Honda Civic with significant force.

The front seat passenger was ejected onto the roadway with "extensive injuries and bleeding." The accident trapped the driver of the Honda Civic, killing him in the crash. The rear and front seat passengers were seriously injured and transported to the hospital. The rear seat passenger died several weeks later from his injuries, and the front seat passenger lost one eye and suffered other significant injuries.

---

[2] This court also reviewed the BWC videos.

A-2087-23

State Troopers responded to the crash scene at approximately 10:41 p.m. Celi spoke to defendant, who was seated on nearby grass. The tow truck and Honda Civic came to rest approximately fifty feet away from the point of impact. The tow truck had partially pinned the Honda Civic into the ground. Celi testified he did not observe any visible injuries on defendant, but defendant complained of head and leg pain. Defendant advised Celi that when the accident occurred, he was returning from cleaning up an accident in Sparta.

Celi investigated the crash site. He observed "extensive damage" to the Honda Civic, specifically to the front driver's side of the vehicle, with objects and broken glass spread "all over the place." The tow truck sustained heavy damage to the driver's side. Both vehicles that had been towed by defendant's truck were also damaged. Celi explained his role was to get treatment for the injured parties, ensure the safety of the accident scene for other vehicles using the road, and coordinate efforts with other agencies to identify the individuals involved.

Celi testified that numerous witnesses and agencies responded due to "the seriousness of the accident." He described how the fire department assisted with the extraction, emergency medical services assisted with injuries, the New Jersey Department of Transportation helped with road closures, and a Sparta

4

police officer was also at the scene. Celi explained that the Fatal Accident Investigation Unit was primarily concerned with how the crash occurred and crash reconstruction and was assisted by the Crime Scene Unit.

Celi testified that defendant walked over from the grassy area to the crash scene and was "kind of staggering a little bit." According to Celi, defendant told him that the tow truck did not have an anti-lock braking system, which caused too much weight on the lift. Defendant claimed the front wheels raised because of the rear vehicle weight, and he hit the brakes, which caused the tow truck to "skid[]" into the Honda Civic. Defendant advised Celi that he begged his boss to fix the brakes. Celi testified that defendant also explained he was driving down a hill, the brakes locked, he was unable to stop the tow truck in time, and he drove into the nearby woods before the crash.

Defendant appeared "sweaty" to Celi due to the weather. Celi instructed defendant to wait for medical assistance and asked if he had his driver's license, registration, and proof of insurance. Celi testified that defendant gave him permission to retrieve his driver's license from his wallet and vehicle paperwork located inside the tow truck. This search was not challenged at the motion to suppress hearing.

A-2087-23

Upon entering the tow truck through the passenger-side door, Celi noticed "[i]tems scattered throughout the vehicle[,] . . . the passenger[-]side floor and all over the center console area." Celi testified that he saw a bottle of prescription pills and a wallet in "plain view." Celi stated that the "color of [the bottle] and [bottle] label[]" caught his attention. Celi testified the bottle contained Sertraline pills—commonly known by the brand name Zoloft—which he placed back on the passenger seat. After finding the Sertraline, Celi spoke with defendant, who confirmed it was a generic form of Zoloft that had been prescribed to him. Celi retrieved the tow truck's registration and insurance information, but defendant's driver's license was not found in his wallet.

While defendant was on a stretcher in an ambulance about to be transported to the hospital, Celi testified he asked him about the license. Defendant responded the license was in another wallet inside the tow truck. Celi stated he re-entered the tow truck but was unable to locate defendant's other wallet.

Later that evening, at approximately 11:10 p.m., Rodriguez arrived on the accident scene to assist Celi with "all technical aspects" of the investigation and to investigate the cause of the accident. Rodriguez testified that he has expertise in the field of commercial vehicle crash investigation. Rodriguez evaluated the

6

accident scene and inspected the roadway for tire tracks, the vehicles' "airbags, [seatbelts,] occupant placement," and "gross vehicle weight." Celi informed Rodriguez about the Sertraline pills found inside the tow truck.

Rodriguez observed a single set of skid marks on the road exiting the southbound lane, which he pointed out to Celi. The audio portion of the BWC recorded the officers' observations that defendant's tow truck "clearly had brakes" due to the "rubber on asphalt," but noted the tow truck's rear brakes could have malfunctioned because there was only a single visible set of tire tracks. The tow truck had dual rear wheels on each side of the rear axle, which meant that only the front brakes were in use at the time of impact. Rodriguez testified that the tow truck had traveled "approximately 217 feet" from the start of braking to the point of impact.

Based on the serious nature of the accident, Rodriguez testified that non-law enforcement personnel was needed "to get the [two] vehicles apart." To accomplish this, Rodriguez suggested the brakes might have to be disengaged or the steering wheel would have to be moved in different directions. As part of standard operating procedures for major crash investigations, Rodriguez testified observations had to be made and documented for his report before

7

relocation preparation occurred, and the tow truck's interior had to be undisturbed and free of debris before being removed from the roadway.

Rodriguez testified that as part of his duties, he would need to obtain the gross weight of the tow truck by opening the passenger side door and looking at the vehicle identification number placard, which is usually located on the driver's side door. Rodriguez explained that gross vehicle weight is required for completing NJSP crash reporting forms and information on airbag deployment. In addition, Rodriguez testified that gross weight helps determine if a vehicle is "overweight for the roadway or overweight for its own capacity." In that regard, Rodriguez also explained that gross weight is useful in determining whether a vehicle is overweight, which could impact its operation and ability to stop.

As to this accident, however, the driver's side door of the tow truck could not be opened due to damage from the crash. Accordingly, Rodriguez explained that he opened the passenger door of the tow truck, evaluated the seatbelts to ascertain if they were in use at the time of the crash, and found there was no airbag, but stopped short of documenting the tow truck's weight. He also explained the accident scene had to be documented "prior to moving and cutting the vehicles to get the [Honda Civic] driver out."

8

Rodriguez stated that he and Detective Sergeant Van Lenten,[3] who was assigned to photograph the accident scene, had entered the passenger side footwell of the tow truck to photograph the seatbelts and lack of an airbag. Rodriguez also testified that upon opening the door and stepping onto a footwell on the side of the vehicle, "we observed [in] plain view suspected folds of heroin" on the driver's seat and driver-side floor of the tow truck. Van Lenten told Rodriguez that from the footwell, he saw the prescription bottle on the passenger seat and three wax folds containing suspected heroin on the driver's seat and driver-side floorboard in "plain view." Rodriguez "looked" and confirmed Van Lenten's observations. The suspected heroin was then removed, but no further search of the tow truck was conducted.

Rodriguez explained he exited the tow truck without completing the inspection because the fatal crash investigation "morphed" into a criminal investigation with "possible driver impairment." Rodriguez testified that he would not have entered the tow truck if he knew there was a criminal investigation in progress. Rodriguez stated he was able to gather information on whether the tow truck's seatbelts were used and if there were no airbags, but he was unable to document the gross weight because the inspection was

---

[3] Detective Sergeant Van Lenten's first name is not contained in the record.

9

terminated "due to the plain view [of controlled dangerous substances] (CDS)." Law enforcement proceeded to secure the tow truck until a search warrant could be obtained to search the remainder of the vehicle. Rodriguez testified that the tow truck was impounded because it was disabled and due to the criminal investigation. The Honda Civic was also impounded.

At this point, a criminal investigation was underway, and a telephonic search warrant was applied for to obtain defendant's blood and urine samples. The telephonic search warrant was granted on August 6, 2019, while defendant was still at the hospital.

A hospital employee drew defendant's blood, and he provided the urine sample himself. Defendant's blood and urine samples were taken by Detective Kyle Phlegar of the Sussex County Prosecutor's Office to NMS Labs in Horsham, Pennsylvania for testing. Defendant's blood and urine samples tested positive for "numerous psychoactive drugs," such as fentanyl, acetyl fentanyl, morphine, clonazepam (Klonopin), and alprazolam (Xanax). Other illegal substances "indicative" of heroin use were found in defendant's urine. On August 9, 2019, a judge approved a search warrant to search defendant's cell phone and truck.

Rodriguez testified that vehicles involved in crashes are routinely searched for an inventory of property to document personal belongings within the vehicle. After a search warrant for a mechanical inspection of the tow truck and defendant's cell phone was issued, Rodriguez testified he performed another interior and exterior inspection, as well as a mechanical inspection, to "rule out any mechanical factors [ ] causing the crash." Rodriguez testified that at the time of the accident, his unit had not been issued BWCs, and the footage of him entering the tow truck was captured from the BWC of another officer. During this subsequent search of the tow truck, other objects were discovered, including a glass smoking pipe. Following his discharge from the hospital, defendant was interviewed at the NJSP Sussex Station and agreed to provide a recorded statement.

On December 12, 2019, a Sussex County grand jury charged defendant with two counts of second-degree reckless vehicular homicide, N.J.S.A. 2C:11-5(a) (counts one and two); fourth-degree assault-by-auto, N.J.S.A. 2C:12-1(c)(1) (count three); third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1) (count four); third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (count five); and third-degree possession of fentanyl, N.J.S.A. 2C:35-10(a)(1) (count six).

11

On October 23, 2020, defendant moved to suppress physical evidence seized from the tow truck. On February 28, 2022, defendant supplemented his motion to suppress to include the suppression of the blood and urine test results obtained in accordance with the telephonic search warrant. Defendant contended the wax folds found in the tow truck were the product of an unlawful search by Rodriguez. Defendant argued the laboratory test results of his blood and urine should also be suppressed because they are "fruit of the poisonous tree." At the conclusion of the suppression hearing, defendant made an oral request for a Franks[4] hearing based on Celi's testimony.

Defendant maintained the search warrant for his blood and urine should be invalidated because Celi "acted with reckless disregard for the truth during the telephonic application by providing [the] [c]ourt with false statements and omitting relevant information." The trial court gave defendant the opportunity to file a formal Franks motion, requested written summations on the motion to suppress, and reserved decision.

---

[4] Franks v. Delaware, 438 U.S. 154 (1978). A defendant is entitled to a Franks hearing to challenge the veracity of a search warrant affidavit by demonstrating a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." Id. at 155-56; see also State v. Howery, 80 N.J. 563, 567-68 (1979) (adopting the Franks standard in New Jersey).

On January 25, 2023, the trial court denied defendant's motion to suppress in an order and thirty-eight-page statement of reasons. The trial court found the second search conducted by Rodriguez was lawful because the tow truck was "subject to an administrative inspection." The trial court reasoned that Rodriguez's acting as a fatal crash investigator and his observation of the wax folds was pursuant to "an appropriate and legal administrative inspection" and was performed "in accordance with his statutory obligation to document information" relating to the commercial vehicle crash.

The trial court credited Rodriguez's observations made through the tow truck's passenger side window while standing on the footwell was done in accordance with his "obligations" to conduct a fatal crash investigation and complete the New Jersey crash investigation form. The trial court found that Rodriguez entered the tow truck to "inspect the airbags, seatbelts, and occupant placement." In that regard, the trial court noted that determining seatbelt status "is a critical function of the inspection" and must be done before the vehicle is moved or transported.

Citing our decision in State v. Pompa, the trial court reasoned that "New Jersey has an interest in guaranteeing the safety of drivers on its roadway and, to that end, warrantless administrative inspections further that interest by

13

ensuring that the largest vehicles on [the] roads are safe for transit and in compliance with established regulations." 414 N.J. Super. 219, 231-33 (App. Div. 2010). The trial court determined that the administrative search performed was conducted under a "valid regulatory program."

The trial court found the search was limited "in time, place[,] and scope" and upon viewing the wax folds, Rodriguez "immediately terminated the investigation." The trial court noted that defendant, as an operator of a commercial vehicle, "could not help but be aware that his vehicle could be subject to these types of searches," citing State v. Hewitt, 400 N.J. Super. 376, 384 (2008). The trial court emphasized that as part of a fatal vehicular inspection involving a commercial vehicle, Rodriguez was "required to get the gross weight of the vehicle."

The trial court also found that the wax folds would have been inevitably discovered because the tow truck would have been inventoried once impounded. Given the serious nature of the crash, and the number of vehicles and parties involved, an inventory search would have been conducted "to ensure that there was no loss of property under normal police procedures." The trial court relied on BWC footage, which revealed "that a number of items were being thrown

from the vehicle and laying next to the tow truck," combined with corroborating testimony on this issue.

With regard to the potential inevitable discovery of the wax folds through a search warrant, the trial court determined that a search warrant for the tow truck would have been sought even if the wax folds were not found. The trial court grounded its decision on the seriousness of the crash, noting the two fatalities and a passenger with "serious disfigurement," combined with defendant's statement that he had issues with the brakes, and when he hit them, he was unable to stop.

The trial court also reasoned the community caretaking exception to the search warrant requirement applied because there was "an emergent need to preserve property at the time of entry."

Additionally, the trial court found the continuation doctrine exception applied because the NJSP worked together with other officers in a "single, integrated, continuous" investigation. Because of the severity of the crash and injuries, "multiple units and agencies needed to respond and coordinate efforts." The trial court held the warrant to seize defendant's blood and urine was "already in motion" based on sufficient factors when the heroin was discovered.

A-2087-23

The trial court rejected defendant's request for a <u>Franks</u> hearing because defendant had not met his burden by a preponderance of the evidence that Celi "deliberately" misled the court. This appeal followed.

II.

Defendant submits the following arguments for our consideration:

<u>POINT I</u>

THE WAX FOLDS MUST BE SUPPRESSED BECAUSE RODRIGUEZ'S WARRANTLESS SEARCH OF THE TOW TRUCK WAS UNLAWFUL AND CANNOT BE SHOEHORNED INTO ANY OF THE RECOGNIZED EXCEPTIONS TO THE WARRANT REQUIREMENT.

A. The Administrative Search Exception Does Not Apply.

B. The Community Caretaking Exception Does Not Apply.

C. The Reasonable Continuation Doctrine Does Not Apply.

D. The Inevitable Discovery Doctrine Does Not Apply.

1. The State Did Not Establish That Police Would Have Inevitably Discovered The Wax Folds Through An Inventory Search.

2. The State Did Not Establish That Police Would Have Inevitably Discovered The Wax Folds By Applying For And

16

Obtaining A Search Warrant For The Tow Truck.

> 3. The Rationale Behind The Exclusionary Rule Also Weighs In Favor Of Suppression.

POINT II

THE BIOFLUID SAMPLES MUST BE SUPPRESSED BECAUSE WITHOUT INFORMATION CONCERNING THE DISCOVERY OF THE WAX FOLDS, THE WARRANT AUTHORIZING COLLECTION AND TESTING OF THE SAMPLES WAS NOT SUPPORTED BY PROBABLE CAUSE. EVEN IF THE WAX FOLDS ARE ADMISSIBLE UNDER THE INEVITABLE DISCOVERY EXCEPTION, THE SAMPLES SHOULD STILL BE SUPPRESSED BECAUSE THEIR EVIDENTIAL VALUE IS TIME-DEPENDENT.

> A. Without The Discovery Of The Wax Folds, The Warrant Authorizing A Blood And Urine Test Was Not Supported By Probable Cause.

> B. Even If This Court Finds That The Wax Folds Would Have Been Inevitably Discovered And Are Therefore Admissible, The Biofluid Samples Must Be Suppressed Because Their Evidential Value Is Time-Dependent.

When reviewing a decision on a motion to suppress, appellate courts defer to a trial court's factual findings and will uphold those findings when they are supported by sufficient, credible evidence in the record. State v. Tiwana, 256 N.J. 33, 40 (2023) (citing State v. A.M., 237 N.J. 384, 395 (2019)). "[F]actual

17

findings based on a video recording or documentary evidence" are reviewed under the same standard. State v. S.S., 229 N.J. 360, 381 (2017). In contrast, appellate courts do not defer to a trial court's legal conclusions, which are reviewed de novo. Tiwana, 256 N.J. at 40 (citing State v. Rockford, 213 N.J. 424, 440 (2013)). The determination of whether an exception to the exclusionary rule applies is a legal conclusion to which an appellate court owes no special deference. See State v. Gamble, 218 N.J. 412, 425-26 (2014).

The United States and New Jersey Constitutions guarantee that individuals shall be free from "unreasonable searches and seizures." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "Generally, a warrantless search or seizure is invalid absent a showing that it 'falls within one of the few well-delineated exceptions to the warrant requirement.'" State v. Alessi, 240 N.J. 501, 517 (2020) (quoting State v. Mann, 203 N.J. 328, 337-38 (2010)).

The scope of review of a search warrant is limited. State v. Chippero, 201 N.J. 14, 32 (2009). "[R]eviewing courts 'should pay substantial deference' to judicial findings of probable cause in search warrant applications." State v. Andrews, 243 N.J. 447, 464 (2020) (quoting State v. Kasabucki, 52 N.J. 110, 117 (1968)). See State v. Marshall, 123 N.J. 1, 72 (1991) ("[w]e accord

substantial deference to the discretionary determination resulting in the issuance of the warrant").

A review of the record establishes that it was inevitable that an application for a warrant to obtain blood and urine samples from defendant would be made and granted. It was also inevitable that the tow truck would be lawfully searched, and the wax folds would be lawfully seized. Therefore, we affirm the suppression order based on the inevitable discovery doctrine, and we do not need to address the other grounds for the search and seizures.

A.    The Inevitable Discovery Doctrine

Defendant argues the State failed to meet its burden to show it would have inevitably discovered the wax folds through an inventory search of the tow truck or by securing a search warrant to search the tow truck based "solely" on having found the generic Zoloft inside.

Addressing the State's position of inevitable discovery of the wax folds' seizure, the State must demonstrate that:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would

have occurred wholly independently of the discovery of such evidence by unlawful means.

[State v. Caronna, 469 N.J. Super. 462, 500 (App. Div. 2021); see also State v. Holland, 176 N.J. 344, 361-62 (2003) (enumerating the facets of the inevitable discovery doctrine).]

The inevitable discovery exception applies here because the officers satisfied all three prongs of the standard.  As we explained in State v. McDaniel, the State must establish that the police inventoried the contents of the vehicle to fulfill one or more of the purposes identified in South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976).  156 N.J. Super. 347, 353 (App. Div. 1978).  Those purposes are "'to protect the owner's property, to protect the police against claims over lost or stolen property and to protect the police from 'potential danger.'"  Ibid.  (quoting Opperman, 428 U.S. at 368-69).

Here, the State established that it would have inventoried the contents of defendant's tow truck to identify and make a record of all items of value found.  Thus, the inventory would have been undertaken to protect defendant's property and the police against claims over lost or stolen property.  In doing so, the wax folds would have inevitably been discovered.  Therefore, the officers' inventory of defendant's tow truck would have been undertaken for one of the purposes

identified in Opperman. We therefore conclude that the wax folds would have inevitably been constitutionally seized.

Additionally, the officers would have inevitably obtained the wax folds by obtaining a search warrant. The inevitable discovery doctrine may be invoked to preserve "the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement." State v. Camey, 239 N.J. 282, 301 (2019). The inevitable discovery exception permits the admission of illegally obtained evidence when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct," thereby negating any taint. State v. Sugar, 108 N.J. 151, 156 (1987) (quoting Nix v. Williams, 467 U.S. 431, 448 (1984)); accord State v. Maltese, 222 N.J. 525, 551-52 (2015).

The State need not establish with particularity "the exact circumstances of the evidence's discovery" nor "the exclusive path leading to the discovery." Sugar, 108 N.J. at 158. Rather, the State may demonstrate the evidence would have eventually been discovered based on the totality of "the evidence understood in light of ordinary experience and common sense." Id. at 163.

Here, the trial court found the inevitable discovery doctrine applied because Celi testified the State would have requested a search warrant for

21

defendant's blood and urine samples even if the wax folds were not found by Rodriguez. The trial court stated:

> This is because of the seriousness of the crash with two resulting fatalities and one person with serious disfigurement, coupled with [d]efendant's explanation of the crash. When troopers initially arrived to the scene, [d]efendant stated he had issues with his brakes and that when he hit them, he was not able to stop the vehicle. . . . . This information was included in the search warrant application for which the [c]ourt finds was enough to execute the search warrant that would lead to the inevitable discovery of the wax folds containing heroin.

Therefore, consistent with the test articulated in <u>Sugar</u> and <u>Maltese</u>, the trial court properly concluded that the wax folds would have been discovered after the search warrant was obtained for defendant's urine and blood. Celi and Rodriguez testified regarding the normal and routine investigatory procedures that the NJSP was employed as part of a fatal vehicle accident investigation. Moreover, Celi testified that the officers applied for the search warrant because the Sertraline bottle was found and due to the fatality and serious injuries sustained. Saliently, the cause of the accident was unclear, and defendant gave different explanations about what happened. Celi testified that determination was made before the wax folds were found by Rodriguez.

22

The trial court reasoned:

> Celi was already in the process of preparing his application [to obtain a sample of defendant's] blood when the heroin was discovered on the passenger seat and floorboard by . . . Rodriguez. . . . In making his application for the search warrant, . . . Celi disclosed to this [c]ourt that [d]efendant told troopers that his wheels locked and that he was unable to stop his vehicle . . . and that [d]efendant did not show any outward signs of intoxication . . . . He also disclosed the presence of [a] generic form of Zoloft in the vehicle and that a second trooper observed suspected CDS.

We conclude that the trial court correctly found (1) the search warrant for defendant's blood and urine samples would have been issued without information about the wax folds; and (2) the wax folds would have been inevitably discovered after the search warrant for defendant's blood and urine sample was issued.

B.    The Exclusionary Rule Does Not Weigh In Favor of Suppression.

As a general matter, it is long established under both the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution that the exclusionary rule bars the State from admitting evidence obtained from an unconstitutional search or seizure. Wong Sun v. United States, 371 U.S. 471, 485-88 (1963); State v. Shaw, 213 N.J. 398, 412-13 (2012). However, the "fruit of the poisonous tree" doctrine recognized in Wong Sun does not automatically

23

mandate the suppression of all evidence found subsequent to an unlawful search or seizure. 371 U.S. at 487-88.

As our Supreme Court explained in State v. Smith, "[t]he exclusionary rule is not monolithic and inexorable." 212 N.J. 365, 389 (2012). Rather, "[c]ase law has developed certain exceptions to the exclusionary rule, in recognition of the fact that if exclusion in a particular instance will not further purposes of the exclusionary rule, there is no reason for the courts to apply it." Ibid. (citing Nix, 467 U.S. at 443).

Suppression of otherwise relevant and admissible evidence does not turn on whether the illegal search or seizure was a "but for" cause of the State obtaining the evidence a defendant seeks to suppress. Shaw, 213 N.J. at 413. Rather, courts hearing suppression motions must determine whether the evidence "was a product of the 'exploitation of [the primary] illegality'—the wrongful detention—or of 'means sufficiently distinguishable to be purged of the primary taint.'" Ibid. (quoting Wong Sun, 371 U.S. at 488).

The State is not required to show "the exact circumstances of the evidence's discovery" or "the exclusive path leading to the discovery." Sugar, 108 N.J. at 158. "Rather, '[t]he State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in

combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered.'" Camey, 239 N.J. at 302 (quoting Sugar, 108 N.J. at 159). The State can meet its burden by showing inevitable discovery would have occurred "in one or in several ways," based on the totality of "the evidence understood in light of ordinary experience and common sense." Sugar, 108 N.J. at 159, 163.

Consistent with this line of cases, we hold there was no disregard of the Fourth Amendment in the warrantless entry of the tow truck. The evolving investigation—marked by defendant's unclear and conflicting account of the accident—the discovery of Sertraline, and physical evidence, justified Rodriguez's continued efforts. The record demonstrates that Rodriguez was unaware of the telephonic search warrant application. Therefore, the exclusionary rule does not bar introduction of the wax folds into evidence.

After defendant filed his merits brief, our Supreme Court issued a decision in State v. Fenimore, 261 N.J. 364, 377 (2025) (declaring that the automobile exception applies only to on-scene searches). On July 30, 2025, the same day Fenimore was issued, defendant filed a letter pursuant to Rule 2:6-11(d), arguing the State's contentions that the warrant exceptions that are at issue in this case are inapplicable because the Supreme Court in Fenimore "emphasized that

warrantless searches are 'presumptively unreasonable' and that the automobile exception applies only in specific narrow circumstances." In response, the State noted that the "automobile exception has no relevance" in this case and the Supreme Court in Fenimore "explicitly limited its holding to its specific set of facts." We agree with the State and conclude that Fenimore is inapplicable to the facts of this case.

III.

Finally, defendant argues the trial court erred by not suppressing the biofluid samples because the telephonic search warrant did not establish probable cause. As a result, defendant contends the application was "tainted" and may not be used to evaluate whether there was probable cause to believe defendant was driving under the influence and that his blood and urine showed evidence of a crime, citing State v. Ortense, 174 N.J. Super. 453, 454-55 (App. Div. 1980). Defendant proffers "[w]ithout this tainted information," all that is left is the "discovery of generic Zoloft inside the tow truck" and that "a serious accident" occurred.

Taking a "blood sample for the purpose of alcohol-content analysis constitutes a search" under the Fourth Amendment. State v. Zalcberg, 232 N.J. 335, 345 (2018) (citing Schmerber v. California, 384 U.S. 757, 758 (1966)). A

26

warrant for a search can be issued when there is probable cause to believe that the search will produce evidence of a crime. Smith, 212 N.J. at 388 (quoting State v. Marshall, 199 N.J. 602, 610 (2009)). Rule 3:5-3(c) permits a judge to issue a warrant telephonically. Moreover, that Rule does not require exigent circumstances for a telephonic warrant. Sup. Ct. of N.J., Notice to the Bar: Telephonic Requests for Search Warrants for Blood Tests in Driving While Intoxicated (DWI) Cases (Missouri v. McNeely) - Rule Relaxation (Nov. 25, 2013).

Search warrants must "describe with particularity the places subject to search and people or things subject to seizure." Andrews, 243 N.J. at 464 (citing U.S. Const. amend. IV and N.J. Const. art. I, ¶ 7). "Before issuing a warrant, the judge must be satisfied that there is probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched." State v. Sullivan, 169 N.J. 204, 210 (2001).

"Probable cause for the issuance of a search warrant requires a fair probability that contraband or evidence of a crime will be found in a particular place." State v. Gathers, 234 N.J. 208, 223 (2018) (quoting Chippero, 201 N.J. at 28) (internal quotation marks omitted). "[T]he probable cause determination

must be . . . based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously." State v. Boone, 232 N.J. 417, 427 (2017) (alteration in original) (quoting Marshall, 199 N.J. at 611).

> It is well settled that a search executed pursuant to a warrant is presumed to be valid and . . . a defendant challenging its validity has the burden to prove "that there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable."
>
> [State v. Jones, 179 N.J. 377, 388 (2004)].

"[S]ubstantial deference must be paid by a reviewing court to the determination of the judge who has made a finding of probable cause to issue a search warrant." State v. Evers, 175 N.J. 355, 381 (2003). Any "[d]oubt as to the validity of the warrant 'should ordinarily be resolved by sustaining the search.'" State v. Keyes, 184 N.J. 541, 554 (2005) (quoting Jones, 179 N.J. at 389). The same applies in situations where "the adequacy of the facts offered to show probable cause . . . appear[] to be marginal." Jones, 179 N.J. at 388-89 (quoting Kasabucki, 52 N.J. at 116).

When reviewing the validity of a search warrant, the court must look to "the totality of the circumstances" to ascertain if there was probable cause. Chippero, 201 N.J. at 27. Our role is to determine whether the warrant

28

application presented sufficient evidence for a finding of probable cause to search the location for the items sought. Id. at 32. State v. Sheehan, 217 N.J. Super. 20, 27 (App. Div. 1987) (citing United States v. Ventresca, 380 U.S. 102, 109 (1965)).

Celi's testimony in support of the telephonic search warrant delineated the inconsistencies in defendant's statements with respect to the cause of the accident. The lawful discovery of the Sertraline in conjunction with defendant's inconsistent explanations regarding the cause of the accident established probable cause to believe defendant was intoxicated or incapacitated at the time of the accident even without discovery of the wax folds. Moreover, because we are satisfied the wax folds would have been inevitably discovered, defendant's motion to suppress the biofluid samples was properly denied.

Defendant contends that the biofluid samples must be suppressed because their evidential value was time dependent. Defendant cites Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 191 (1993) for the proposition that "[a]s the United States Supreme Court has noted, traces of illegal drugs are continuously eliminated from the bloodstream" and because of that fact, since the wax folds likely would not have been discovered until well after the crash, the blood and urine results would have come back negative for defendant.

At the suppression hearing, the following exchange took place:

> [Defendant's Counsel]: And contact was made with Assistant Prosecutor Rafuse for the purpose of starting the process of making the application for the search warrant before the heroin was found, correct?
>
> [Celi]: Correct.
>
> [Defendant's Counsel]: And wasn't there not concern amongst some of the investigators on the scene that maybe [there] just wasn't enough for probable cause for a blood and urine warrant based upon just Zoloft and the happening of an accident?
>
> [Celi]: There might have been but that's where we all kind of put our heads together at some point and that's where we determined that we would go for the telephonic search warrant.

The record clearly demonstrates that the application for the urine and blood warrant was already in progress before the wax folds were found in defendant's tow truck. Thus, the trial court's finding of that fact is supported by substantial credible evidence. Moreover, Rodriguez testified that he only learned the telephone application for defendant's blood and urine samples was already in progress after he discovered the wax folds. Regardless of when the wax folds were found in the tow truck, the application for the telephonic search warrant was already in progress, and therefore, defendant's argument about timing is not supported by the record.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-2087-23